**William G. MARSHALL, Jr., Plaintiff,**

v.

**Edward PLANZ, et al., Defendants.**

**Civil Action No. 97–T–793–S.**

United States District Court,
M.D. Alabama,
Southern Division.

July 8, 1998.

Joseph Terrace Carpenter, Nathan C. Prater, Montgomery, AL, Jeffrey S. Jacobovitz, Mark L. Rosenberg, Alan A.B. McDowell, Beth M. Kramer, Michaels, Wishner & Bonner, P.C., Washington, DC, for William G. Marshall, Jr., M.D.

Kerry Phillip Luke, Edward O. Conerly, Hall, Conerly, Mudd & Bolvig, Birmingham, AL, John F. Mandt, Phillip A. Nichols, Balch & Bingham, Birmingham, AL, Michael Baird Beers, Winston Whitehead Edwards, Beers, Anderson, Jacksonn, Hughes & Patty, PC, Montgomery, AL, Joseph C. Espy, III, A. Lester (Les) Hayes, III, Melton, Espy, Williams & Hayes, P.C., Montgomery, AL, Paul G. Smith, Matthew C. Williams, Smith, Spires & Peddy, Birmingham, AL, for Edward Planz, M.D.

Kerry Phillip Luke, Edward O. Conerly, Hall, Conerly, Mudd & Bolvig, Birmingham, AL, John F. Mandt, Phillip A. Nichols, Balch & Bingham, Birmingham, AL, Michael Baird Beers, Winston Whitehead Edwards, Beers, Anderson, Jacksonn, Hughes & Patty, PC, Montgomery, AL, Joseph C. Espy, III, A. Lester (Les) Hayes, III, Melton, Espy, Williams & Hayes, P.C., Montgomery, AL, for Southeastern Cardiovascular Associates, P.C.

### ORDER

MYRON H. THOMPSON, District Judge.

Plaintiff William G. Marshall, Jr., M.D., brings this lawsuit against defendants Edward Planz, M.D. (his former business partner) and Southeastern Cardiovascular Associates, P.C. ("SCA") (a corporation of which Planz is currently, and Marshall was formerly, a shareholder and employee) alleging claims grounded on §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C.A. §§ 1 and 2, and § 4 of the Clayton Act, 15 U.S.C.A. § 15, as well as numerous state-law claims, namely tortious interference with business and contractual relations, defamation, breach of contract, monopolization, and civil conspiracy. All of Marshall's claims stem from Planz's termination of their business relationship, and events surrounding Marshall's loss of surgical privileges at two hospitals in Dothan, Alabama, where the two physicians conducted their surgical practices. This court has federal-question jurisdiction over this lawsuit pursuant to 28 U.S.C.A. §§ 1331 and 1337, and supplemental jurisdiction over Marshall's state-law claims pursuant to 28 U.S.C.A. § 1367(a).

Pending before the court is the motion for summary judgment filed by the defendants as to Marshall's federal and state antitrust claims.[1] The defendants' motion raises a difficult question concerning the so-called state-action immunity doctrine that is applicable in antitrust actions. Specifically, it is well-settled that states enjoy immunity from federal antitrust lawsuits that stem from their actions as sovereign. *See Parker v. Brown,* 317 U.S. 341, 351–53, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943); *Crosby v. Hospital Auth. of Valdosta and Lowndes County,* 93 F.3d 1515, 1521 (11th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997). As currently applied, the doctrine may be invoked not only by states themselves, but also by states' political subdivisions, including municipal corporations. *See City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 412, 98 S.Ct. 1123, 1137, 55 L.Ed.2d 364 (1978) (Brennan, J., plurality opinion); *See also Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 38–39, 105 S.Ct. 1713, 1716, 85 L.Ed.2d 24 (1985). Moreover, state action immunity has also been extended to hospital authorities established under state statutes, *see Crosby,* 93 F.3d at 1522–26 (holding that a Georgia hospital is a political subdivision of the state, because the nexus between the hospital and the state is sufficiently close); *Askew v. DCH Reg. Health Care Auth.,* 995 F.2d 1033, 1037–38 (11th Cir.1993) (holding that hospital authorities created under the Alabama Health Care Authorities Act are political subdivisions of the State of Alabama), and to physicians at such hospitals who participate as official members of peer-review committees. *See Crosby,* 93 F.3d at 1530. The difficult question presented here is whether state action immunity should be further extended to individual physicians who do not serve as official members of a hospital's peer-review committees, but who initiate proceedings against fellow physicians before the committees or furnish information to them. As explained below, however, the court does not need to address this question in view of its conclusion that the defendants'

---

1. In their motion for summary judgment, the defendants also seek summary judgment on the remainder of Marshall's state-law claims, with the exception of the breach-of-contract claim. This order, however, addresses only the federal and state antitrust claims.

motion is due to be granted as to all of Marshall's antitrust claims because he has failed to establish that the defendants' actions actually caused his alleged antitrust injuries.

## I. BACKGROUND

The pertinent facts of this lawsuit, viewed in the light most favorable to Marshall, who is the non-movant with respect to the defendants' motion for summary judgment concerning the federal and state antitrust claims, are as follows.

- In 1992, Marshall joined SCA, a professional corporation in which he and Planz were the sole shareholders and employees. The focus of both physicians' practices was cardiovascular surgery, although they also performed other surgical techniques. Both physicians maintained surgical privileges at Southeast Alabama Medical Center ("SAMC"), a hospital owned and operated by the Houston County Health Care Authority, and Flowers Hospital, the two primary care hospitals located in Dothan, Alabama. In 1988, SAMC had been reincorporated under the Alabama Health Care Authorities Act of 1982, 1975 Ala.Code §§ 22–21–310 through 22–21–344 (Michie 1997).

- In 1994, Marshall and Planz executed a shareholders and deferred compensation agreement, pursuant to which they became equal financial partners in SCA, dividing all revenues from their practices equally after expenses. Under the agreement, Planz retained authority to sever the partnership without cause. The agreement was silent, however, as to whether Marshall could continue to practice medicine independently in Dothan should the partnership be dissolved.

- In July 1996, Dr. Steven Johnson, a third cardiovascular surgeon, joined SCA.

- On July 23, 1996, Marshall and Planz were informed by letter that the Quality Risk Management Committee ("Quality Committee") had established an ad hoc committee to investigate the circumstances surrounding the unexpected deaths of five of Marshall's cardiovascular patients in the preceding two months.

- The Quality Committee's investigation into Marshall's performance at SAMC was not the first instance in which a hospital committee had responded to concerns and complaints regarding Marshall. Starting in 1993, both SAMC's Executive and Credentials Committee ("E & C Committee") and its Peer Review Committee met on numerous occasions to take up complaints about Marshall's "unacceptable" and "inappropriate" behavior toward hospital personnel, as well as concerns about Marshall's mortality statistics. On at least three occasions, in April and December 1994, and July 1995, the E & C Committee had voted to defer elevating Marshall's privileges from associate staff status to active staff status, citing Marshall's unacceptable conduct toward others at the hospital.

- In the summer of 1996, Planz attended a conference where he learned about expected changes in Medicare reimbursement for cardiac services, and he subsequently expressed concern to both Marshall and Johnson that the proposed decreases in reimbursement would adversely affect SCA's revenues and their individual incomes.

- Shortly after attending the summer conference, in August 1996, Planz informed James Blackmon, then Chief Executive Officer of SAMC, that he planned to terminate his partnership with Marshall.[2] Planz had not yet informed Marshall of his intentions. In his conversation with Blackmon, Planz sought assurances that SAMC would support Planz in his efforts to sever his relationship with Marshall.

---

**2.** It should be noted that the defendants challenge on hearsay grounds the admissibility of Marshall's evidence regarding this, and various other, conversations that Marshall alleges to have taken place. However, as explained more fully below, the court concludes that Marshall's antitrust claims cannot withstand summary judgment even if all of the alleged conversations did in fact occur and the participants actually said what Marshall alleges them to have said. Consequently, the court will proceed on the assumption that the statements are admissible without addressing the merits of the defendants' challenge.

Planz and Blackmon also discussed the fact that the dissolution of the partnership would have repercussions for Marshall's privileges at SAMC. This aspect of the discussion appears to have focused on an exclusive contract that Planz purportedly signed with the hospital.[3]

- At some point during the Quality Committee's deliberations, Dr. George Veale, who headed the committee, informed Fred Pelle, who was then SAMC's Chief Operating Officer, that it would not be in the latter's "best interest to work against what the committee was trying to do and against what Dr. Planz wanted."

- On August 13, 1996, the E & C Committee, based upon the report prepared by the Quality Committee concerning the unexpected deaths of five of Marshall's cardiovascular patients, voted to request an independent clinical review of the hospital's provision of cardiovascular care. The American Medico–Legal Foundation was enlisted to conduct the review, which, though nominally directed to "Cardiac Surgery and Anesthesia Services" at SAMC, in fact focused primarily on Marshall's performance at the hospital.

- After completing its review, which included interviews with hospital staff, the foundation prepared a report, which stated that Marshall's practice demonstrated "an unacceptably high mortality rate and complication rate," perhaps due to his surgical techniques. The report also recommended that Marshall be subjected to a number of additional evaluations, including a medical evaluation of a cervical disc problem that he had suffered, drug testing, and a "preceptorship" at a major cardiac center for at least a month. The report advised that Marshall be suspended pending completion of these processes. Marshall raises numerous objections to the methodology employed in the preparation of this report, and contests its conclusions and recommendations.

- In mid-November 1996, Planz informed Marshall that he had decided to terminate their partnership pursuant to the terms of their shareholder agreement.

- On a Friday in late November, 1996, Planz expressed his concern to Dr. James York, an anesthesiologist at SAMC who was scheduled to operate with Marshall on the following Monday, that because of his cervical disk problem Marshall was suffering from back pain and numbness that could impair his ability to perform surgery. At some point in the course of the ensuing conversations among Drs. Planz, York, Veale, Dr. Wayne Hannah (SAMC's Medical Director), and Dr. Ross Clifton (Marshall's treating physician), Planz stated to Clifton that Marshall had been suspended by the hospital's E & C Committee, a statement which Marshall alleges to have been untrue. Because of the concern over his ability to operate, Marshall voluntarily removed himself from the surgical roster.

- In December 1996, Planz informed Pelle, who had by then succeeded Blackmon as Chief Executive Officer of SAMC, that he would sue the hospital, based upon the purported exclusive contract between the hospital and Planz, if it continued to work with, or financially support, Marshall despite the dissolution of the Planz–Marshall partnership. Pelle perceived Planz's statements to him as indicating that he would be unhappy with Pelle and the hospital if the assurances that Blackmon had initially provided to Planz would not be honored.

- Also in December 1996, Marshall discussed with Pelle the possibility of Marshall's establishing an independent practice at SAMC, and Pelle assured Marshall that as long as Marshall remained at the hospital Pelle wanted to ensure that Marshall would be treated fairly.

---

**3.** The uncontradicted record shows that no such exclusive contract ever existed. However, Marshall has proffered evidence suggesting that Blackmon and Planz contemplated executing such a contract in the wake of the dissolution of the Marshall–Planz partnership, or, alternatively, that an already existing, but unsigned, exclusive contract between Planz and SAMC would be executed.

● On January 3, 1997, Planz and Clifton met' with Hannah, SAMC's Medical Director, to express their concerns regarding Marshall's treatment of patients, patient safety issues, and his relationship with the nursing staff. During this meeting, Planz told Hannah that "something had to be done" about Marshall, because patients were being harmed. Planz's concern stemmed from two of Marshall's patients who had suffered postoperative strokes, and a patient in the intensive care unit for whom Marshall had ordered what Planz and others deemed to have been an ill-advised procedure, which required immediate reversal upon its completion to save the patient's life. In the course of the discussion, Clifton agreed to ask Marshall to discontinue voluntarily his surgical practice. Subsequently, Hannah contacted all available members of the E & C Committee, and each stated that he or she would cast a vote to summarily suspend Marshall should he refuse to voluntarily stop operating on patients. Later that day, because Clifton had been unable to reach Marshall, the E & C Committee unanimously suspended Marshall's surgical privileges until concerns about the quality of care his patients received could be further reviewed at a meeting scheduled for January 14, 1998. At that meeting, the E & C Committee reviewed the report of the American Medico–Legal Foundation and decided to leave in place the suspension of Marshall's surgical privileges.

● The E & C Committee subsequently held a series of hearings concerning the status of Marshall's surgical privileges at SAMC, pursuant to the hospital's peer review process. Numerous witnesses presented testimony regarding Marshall's performance at the hospital, and the evidence heard by the committee included Marshall's operative mortality rate and his relations with the nursing staff and fellow physicians.

● At an informal hearing convened by the E & C Committee on January 30, 1997, Marshall, represented by his attorney, challenged the statistical data regarding his operative outcomes that the committee had relied upon in maintaining its suspension against him. Marshall also proposed a number of solutions to the problem that would permit him to regain his privileges, and his attorney warned the committee that the hospital could be exposing itself to legal liability, especially if the call for Marshall's suspension was originated by Planz. The committee decided to maintain the suspension and continue to proceed with the correction plan outlined in SAMC's bylaws.

● The following day, January 31, 1997, a surgical ad hoc committee charged with investigating the allegations against Marshall held an informal hearing at which Marshall and his attorney were afforded an opportunity to respond to the allegations. After hearing Marshall's rebuttal testimony regarding the allegations of inadequate care and disruptive behavior, including his assertion that the mortality data developed by the outside reviewers distorted his record because he operated on higher risk patients than did Planz and other surgeons, the committee held deliberations and concluded that the external review indicated a quality-of-care problem and that Marshall's admittedly disruptive actions could not be justified. The committee prepared a report summarizing these conclusions and forwarded it to the E & C Committee.

● After receiving the surgical ad hoc committee's report, the E & C Committee voted unanimously to terminate Marshall's privileges at SAMC.

● In February and March 1997, an SAMC hearing committee consisting of three physicians held a formal hearing regarding Marshall's status at the hospital. Testimony was taken regarding the quality of patient care rendered by Marshall, as well as his relations with hospital staff. On April 9, 1997, the hearing committee unanimously recommended that the E & C Committee's decision be upheld "on the basis of disruptive and abusive behavior associated with personnel involved in patient care with implications

of adverse effect on the quality of patient care." The hearing committee rejected the possibility of rehabilitation in Marshall's case.

- Next, the Houston County Health Care Authority Board, which served as SAMC's board of directors, empaneled an appellate review committee, comprising four Board members, to review the prior proceedings related to the proposed revocation of Marshall's privileges. The appellate review committee conducted a hearing on the matter, at which Marshall and his counsel were present, and subsequently recommended that the Board uphold the E & C Committee's decision to revoke Marshall's privileges.

- After considering the appellate review committee's recommendation, the Board voted unanimously to approve the termination of Marshall's surgical privileges at SAMC. Shortly thereafter, Flowers Hospital followed suit and summarily suspended Marshall's privileges based upon the action taken by SAMC.

- During the course of his business relationship with Marshall, Planz had expressed his opinion to Marshall that the presence of a competing cardiovascular surgery group in Dothan would be unwelcome because it could generate competitive bidding for contracts with managed care organizations, and thus decrease SCA's revenues. Planz illustrated his concerns by pointing to the experiences of two medical specialties in which competing groups had merged to prevent managed care organizations or health maintenance organizations from decreasing compensation rates.

- Marshall alleges, and the court assumes as true for purposes of deciding the defendants' motion for summary judgment, that Planz engaged in a systematic campaign to impugn Marshall's personal and professional integrity, as part of Planz's effort to persuade SAMC to strip Marshall of his surgical privileges, and to make it impossible for Marshall to practice cardiovascular surgery in Dothan. Among the defamatory statements that Planz is alleged to have made are: (1) statements to various physicians that Marshall's severe back problems pre-

vented him from operating safely; (2) statements that Marshall was suicidal and mentally unstable; (3) statements associated with the quality-of-care complaint Planz made to SAMC's E & C Committee; (4) statements to various individuals at SAMC that Marshall had abandoned patients; (5) statements to SAMC staff that Marshall "killed" patients; (6) statements to individuals in SAMC's cardiovascular surgery intensive care unit that Marshall's surgical privileges had been terminated and that his orders were to be disregarded; (7) statements to patients and others in Dothan that Marshall had left town and no longer practiced medicine in Dothan; and (8) statements to an outside physician reviewer that Marshall had been suspended from his residency for six months.

- At the time Marshall's ties to SCA were severed, and at all times thereafter, SCA was the sole provider of cardiovascular surgery services in Dothan, Alabama, and a surrounding eleven county region. Since Marshall and SCA parted ways, he has not established an independent cardiovascular surgery practice in this region, although he intended to before he lost his surgical privileges at SAMC and Flowers Hospital.

- After Marshall's departure from SCA, Planz replaced him with a lower-paid physician-associate, resulting in an increase in Planz's income despite a decrease in his caseload.

## II. MOTION FOR SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta,* 2 F.3d

1112, 1115–17 (11th Cir.1993) (discussing how the responsibilities of the movant and the nonmovant vary depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or nonmovant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## III. FEDERAL ANTITRUST CLAIMS

In their motion for summary judgment, the defendants contend that the court should dismiss Marshall's antitrust claims without reaching their merits, on two alternative grounds: (1) because Marshall lacks standing to bring antitrust claims against them, and (2) because the defendants enjoy immunity against Marshall's antitrust claims. In addition, the defendants assert that the claims should be dismissed on their merits even if Marshall clears the standing and immunity hurdles, for a multitude of reasons.

As is true of virtually every issue that arises in the antitrust context, the standing and immunity challenges raised by the defendants present myriad thorny analytical questions for the court. However, the court does not need to decide either issue here because, as explained below, Marshall is unable to satisfy a basic prerequisite for establishing liability under the antitrust laws, namely that the actions of the defendants actually caused his alleged antitrust injuries.[4]

### A. Causation in Antitrust Cases

Causation in the antitrust context, especially where a physician challenges a hospital's credentialing decision, is a somewhat elusive concept. In applying the antitrust laws, courts have come to recognize two distinct types of causation questions, the first of which is essentially identical to that typically posed in the tort context, and the second of which is unique to antitrust cases. As explained below, it is the first, tort-based causation requirement that presents an insur-

mountable barrier to Marshall's antitrust claims in this lawsuit.

Courts have long recognized that antitrust claims are tortious in nature, and that common-law principles governing tort claims are equally applicable to antitrust claims. *See Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 532–33, 103 S.Ct. 897, 905–06, 74 L.Ed.2d 723 (1983) (proximate causation and other common-law limitations on damages are applicable in antitrust context); *Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 848 (11th Cir.1988) (citing *Myers v. American Dental Ass'n*, 695 F.2d 716, 723 (3rd Cir.1982) (antitrust claims are, in essence, "forms of torts alleging business injury")); *Solomon v. Houston Corrugated Box Co.*, 526 F.2d 389, 392 n. 4 (5th Cir.1976).

■ Among the common-law principles governing tort claims that are applicable in the antitrust context is the requirement that the plaintiff demonstrate that the defendant actually caused the alleged injury. *See Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1459, 1462 (11th Cir.1991) (noting that "A private party seeking to invoke the antitrust laws must show that the defendants caused the alleged injury.... As with other causes of action that are tortious in nature, failing to show causation is fatal to a section 1 [of the Sherman Act] claim"; also applying this requirement to the plaintiff's § 2 claims) (internal citations omitted); *Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1561–62 (11th Cir.1987) ("To recover under the antitrust laws, a plaintiff must prove that a defendant's illegal conduct materially contributed to his injury. Proof of a violation of the Sherman Act standing alone does not establish civil liability"). Thus, to survive the defendants' motion for summary judgment Marshall must proffer sufficient evidence to permit a fact-finder reasonably to infer that Planz's actions actually caused the injuries that Marshall alleges in support of his antitrust claims.

---

4. In deciding this case on the merits without reaching the standing question, the court adheres to the standard set by the Eleventh Circuit in *Levine v. Central Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir.1996) (decision on the merits without addressing standing is appropriate where a court concludes that the plaintiff has not made out an antitrust violation).

■ The second causation question that courts have come to recognize, which is unique to antitrust cases, is often examined in connection with the determination of whether a plaintiff enjoys antitrust standing. In essence, this question involves an assessment of whether the defendants caused a plaintiff what has come to be known as an "antitrust injury"—that is, an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). As the Eleventh Circuit has explained, this second causation question

> "asks for something other than an inquiry into whether an antitrust violation has put a plaintiff in a worse position than it otherwise would have been in. Often an antitrust violation has effects beneficial as well as banned. The causation question asks not whether the antitrust violation caused the plaintiff's injury, but whether the banned effects flowing from that violation—as opposed to the beneficial ones—led to the plaintiff's harm. In many cases this distinction makes a difference. This is so because in many cases the 'injury to competition' an antitrust law was established to prevent is different from an 'injury to competitors' that a breach (or non-breach) of that law may effect. In those cases a competitor cannot complain if injured unless the injury flows from anti-competitive, not anti-competitor, effects."

*Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1427 (11th Cir.1990) (citations omitted).

Typically, in antitrust actions brought by physicians based upon the credentialing decisions of hospitals, courts are confronted with the difficult question of whether the plaintiff, who plainly suffered some sort of injury as a result of the alleged monopolists' conduct, suffered the type of injury that is compensable under the antitrust laws. Thus, in these cases the first question discussed above,

whether the defendants actually caused the plaintiffs' injuries, is rarely at issue; instead, causation is firmly established, but the courts must examine the record for evidence that the plaintiff suffered the ever-elusive "antitrust injury" described above. For instance, in *Todorov* the Eleventh Circuit denied antitrust standing to a physician who challenged a hospital's rejection of his application for privileges because it found that the physician had only shown that he had been deprived of "the profits he would have garnered had he been able to share a part of the [other physicians'] supercompetitive, or monopoly, profits." 921 F.2d at 1453–54. The court observed that such an injury clearly is not an antitrust injury, as defined above, because "the antitrust laws were not enacted to permit one person to profit from the anticompetitive behavior of another person." *Id.* at 1454; *see also Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 709 (4th Cir.1991) (noting that "the aphorism that 'the antitrust laws were enacted for the "protection of *competition, not competitors,*"' rings true" where the physician-plaintiff had not demonstrated harms to competition in the relevant market); *Robles v. Humana Hosp. Cartersville*, 785 F.Supp. 989, 998–99 (N.D.Ga.1992) (finding no antitrust injury because complaint alleged only "harm to the individual doctor and not to competition within the marketplace").

Here, by contrast, the injuries that Marshall alleges to have suffered—namely, the loss of his practice in Dothan and his inability to reestablish it due to the revocation of his surgical privileges at the only two hospitals in Dothan at which cardiac surgery is performed—appear to fit snugly within the parameters of "antitrust injury," for he complains that Planz's challenged actions were calculated to create and/or maintain his monopoly over cardiac-surgery services in the relevant market by ensuring that Marshall, a potential provider of these services who would increase competition and lower prices, could not practice medicine in the market.[5]

---

5. The court emphasizes that it has not fully considered the question of whether Marshall has established the requisite antitrust injury, which requires a complicated analysis of whether the harms he complains of truly flow from any harms to competition worked by the revocation

of his surgical privileges in Dothan. However, because Marshall has not satisfied the tort-based causation requirement for the reasons explained in the text of this order, the court is not called upon to decide the antitrust-injury question.

*See Boczar v. Manatee Hosps. & Health Systems, Inc.*, 993 F.2d 1514, 1519 (11th Cir. 1993) (holding that sufficient evidence existed to support a finding that a physician suffered antitrust injury where her loss of privileges ended her ability to compete in the relevant market and burdened her ability to compete generally). However, Marshall's antitrust claims founder on the first, tort-based, causation requirement discussed above because he has not mustered the evidence necessary to establish that the *defendants'* actions actually caused his alleged antitrust injuries. Instead, as explained more fully below, it is beyond legitimate dispute that any antitrust injuries suffered by Marshall were solely caused by the unilateral decision of SAMC's board of directors to revoke Marshall's surgical privileges after the completion of the peer review proceedings regarding his performance at the hospital, and by the subsequent decision by Flowers Hospital to follow suit based upon SAMC's decision.

### B. The Actions Marshall Alleges to Have Caused Him Antitrust Injury

To explain the basis for its finding that Marshall has failed to establish causation, the court will first examine more closely the conduct of Planz that Marshall challenges as unlawful under §§ 1 and 2 of the Sherman Act. For reasons that will become clear when it discusses the relative roles of Planz and SAMC's board of directors in the decision to revoke Marshall's surgical privileges, the court will classify Planz's challenged conduct as falling within one or both of two distinct categories: conduct associated with the peer review proceedings at the hospital, and conduct that was wholly separate from that process.

Drawing upon the pretrial order entered in this case, in which Marshall provides a concise summary of Planz's allegedly anticom-

petitive conduct, the court observes that Marshall challenges three broad classes of Planz's activities. First, Marshall alleges that "Before and during the peer review [process at SAMC], Dr. Planz maliciously spread false and defamatory statements to SAMC officials, physicians, and others." [6] Second, Marshall contends that Planz threatened SAMC and individuals with lawsuits or other adverse consequences if they sided with Marshall and supported him in establishing an independent practice in Dothan.[7] Third, Marshall alleges that Planz exerted "pressure on SAMC officials 'to do something' about Dr. Marshall" and instigated the peer review process that led to the revocation of Marshall's privileges by demanding that the hospital suspend his privileges "for a confused litany of reasons." [8]

Most of these allegedly unlawful activities and statements fall within the first category described above, that is, conduct associated with SAMC's peer review process. Some of these are essentially inseparable from that process, including his alleged exhortations that the hospital "do something" about Marshall, his instigation of the peer review process by lodging a complaint about Marshall's performance, his alleged statements to hospital personnel that Marshall was suicidal and that his back problems impeded his ability to perform surgery, and, finally, Planz's alleged statement to the outside reviewers from the American Medico–Legal Foundation that Marshall had been suspended from his residency for six months. Other challenged statements allegedly made by Planz, while less closely tied to the peer review process, were nonetheless obviously calculated to, as Marshall puts it in his allegations in the pretrial order, "poison[ ] the medical staff's perceptions of Dr. Marshall's personal and professional character," so that it became "a

---

**6.** Order on pretrial hearing, entered on June 18, 1998, at 4. Within this broad category Marshall points to six specific statements he attributes to Planz: (1) that Marshall routinely killed patients; (2) that he had a personality disorder and was suicidal; (3) that he abandoned his patients; (4) that he was suspended from his residency for six months; (5) that his privileges had been revoked, when in fact they had only been suspended at the time; and (6) that he was a danger to patients because he had cervical disc disease and other medical problems. *See id.* at 4–5. In his com-

plaint. Marshall also alleges that Planz told "patients and others" in Dothan that Marshall had left town and would not resume practicing medicine in Dothan, which was untrue at the time. *See* Plaintiff's second amended compl., filed on Oct. 23, 1997, at ¶ 33.

**7.** Order on pretrial hearing, entered on June 18, 1998, at 2, 3.

**8.** *Id.* at 5.

virtual certainty that Marshall would be terminated based upon any excuse."[9] Thus, these alleged remarks, which include the statement that Marshall killed his patients, that he abandoned his patients, and that his privileges had been terminated rather than suspended, also fall within the category of statements that are associated with the peer review proceedings.

This leaves only three challenged actions that arguably occurred outside the peer review process: (1) Planz's alleged threat to sue SAMC if it chose to support Marshall's independent practice after the partnership between the two physicians was severed; (2) Planz's alleged threat to prevent the hospital's perfusionists from providing Marshall with necessary services after dissolution of the partnership; and (3) Planz's alleged remarks to individuals in Dothan that Marshall had left town and no longer intended to practice medicine in Dothan.

### C. Did the Challenged Actions of Planz Cause Marshall's Alleged Antitrust Injuries?

The next step for the court is to determine whether any of the foregoing actions or statements ascribed to Planz, either individually or collectively, actually caused the antitrust injuries that Marshall alleges. For the following reasons, the court finds that Marshall has failed to demonstrate the requisite causation.

The court readily concludes that the actions and statements falling within the first category described above, conduct associated with the peer review process, did not actually cause Marshall's alleged antitrust injuries. The court arrives at this conclusion chiefly because the ultimate, allegedly trade-restraining, outcome of this challenged conduct was the revocation of Marshall's surgical

privileges by SAMC's board. In other words, the individual actions themselves, on their own or collectively, did not, and indeed could not, amount to an unlawful restraint on Marshall's ability to compete against the defendants. Instead, the revocation of Marshall's privileges, first by SAMC and immediately thereafter by Flowers Hospital, was the sole action that could have—by barring him from establishing a viable medical practice in Dothan—caused the alleged antitrust injuries. In fact, Marshall himself concedes as much in his contentions in the pretrial order entered in this lawsuit, where he states that "Dr. Planz could not prevent Dr. Marshall from establishing a competing cardiac surgery practice unless Dr. Marshall's privileges were suspended and/or revoked at SAMC and Flowers. Therefore, he undertook a campaign to destroy any chance for Dr. Marshall to conduct an independent practice of cardiac surgery in Dothan."[10]

Moreover, the court reaches the same conclusion regarding the alleged acts that occurred *outside* the peer review context. The court agrees with Marshall that these statements and threats arguably were not calculated to, and in fact did not, influence the peer review process. However, nothing in the record persuades the court that this alleged conduct, even if it did indeed occur, resulted in Marshall's alleged antitrust injuries. While Marshall points to a significant body of evidence indicating that he suffered damages as a result of the revocation of his privileges at the two Dothan hospitals, he has not proffered *any* evidence to establish that Planz's conduct outside the peer review process could have—absent the hospitals' decisions to revoke privileges—caused him antitrust injury.[11]

---

9. Order on pretrial hearing, entered on June 18, 1998, at 5.

10. Pretrial order, entered on June 18, 1998, at 3.

11. Of course, once the decision to revoke Marshall's privileges was made, Planz's actions outside of the peer-review context were rendered wholly superfluous, and could not have further hindered Marshall's ability to compete in Dothan. For instance, the two alleged threats made by Planz to SAMC officials appear to have been calculated to persuade the hospital to impede Marshall's ability to compete against Planz by withdrawing necessary support for Marshall's practice, while the alleged remark to individuals in Dothan appears to have been aimed at interfering with his practice by discouraging patients from seeking his services. However, once SAMC and Flowers Hospital revoked Marshall's surgical privileges, he was no longer in a position to pursue a competing practice in Dothan because he could not perform surgery at either hospital. Thus, in reality it was the revocation of Marshall's privileges, if anything, that caused his alleged antitrust injuries.

In summary, then, it is evident that any antitrust injury that Marshall could conceivably prove would have stemmed from the revocation of his surgical privileges at the two hospitals, and Planz's allegedly unlawful activity that lead up to or was associated with that decision, standing alone, was merely ancillary to the true source of Marshall's alleged injuries and the action that actually animates this lawsuit—in Marshall's own words, the "unwarranted revocation of Dr. Marshall's privileges at the Medical Center."[12]

Furthermore, it is beyond legitimate dispute that Planz's challenged conduct did not actually cause the revocation of Marshall's privileges. Instead, that action was taken exclusively and independently by SAMC's board of directors itself. The record establishes incontrovertibly that the board retained the ultimate and exclusive decision-making power over the revocation decision, and that it did not merely rubberstamp the recommendations of its peer review committees or any individual physicians, including Planz. In so doing, the hospital acted in accordance with § 22–21–318 of the Alabama Health Care Authorities Act of 1982, under which it had been reincorporated in 1988, see 1975 Ala.Code § 22–21–318(a)(12) (authorizing hospital authorities organized under the Act "To select and appoint medical and dental staff members and others licensed to practice the healing arts and to delineate and define the privileges granted to each such individual"); *Todorov*, 921 F.2d at 1461 (observing that the Act specifically authorizes hospitals "to make decisions concerning the granting of privileges"), as well as the by-laws governing the medical staff at SAMC.[13] Marshall does not dispute these facts, nor does he offer any evidence that the board reached its decision without conducting its own, independent review. Moreover, the court's own examination of the record reveals no suggestion that board ceded control over the ultimate decision to any hospital committee or individual staff members. Thus, there is no question that the ultimate decision to terminate Marshall's surgical privileges was not the final result of a scheme to restrain trade hatched by Planz alone or with the participation of others at SAMC. Under these circumstances, the court concludes that Marshall has failed to establish, as he must to maintain his antitrust claims, that the defendants actually caused his alleged antitrust injuries.

In *Todorov*, the Eleventh Circuit reached the same conclusion on closely analogous facts, ruling that a physician's failure to establish that the defendant physicians caused his alleged antitrust injuries was fatal to his claims under §§ 1 and 2 of the Sherman Act. As previously stated, the *Todorov* court had found that the plaintiff lacked standing because he did not allege the requisite antitrust injury. *See* 921 F.2d at 1453–54. The court went on, however, to explain that the plaintiff's claims against three radiologists at the hospital—who had allegedly conspired among themselves to monopolize the relevant market and had enlisted the hospital board's aid by convincing it to deny the plaintiff's request for privileges—would not survive even if the plaintiff enjoyed antitrust standing because the hospital had acted *unilaterally* in denying the application for privileges. *See id.* at 1459. The court concluded that "the radiologists, regardless of their desires, were not causally responsible for" the decision to deny privileges, and therefore that the plaintiff could not maintain an action under either § 1 or § 2 of the Sherman act, because he was unable to prove that the defendant radiologists caused his injury. *Id.* at 1459, 1462.

■ To be sure, the court recognizes that under certain circumstances a plaintiff may succeed in making out a claim under § 1 of the Sherman Act by demonstrating that a hospital and members of its medical staff conspired to restrain trade. *See Todorov*, 921 F.2d at 1455; *Bolt v. Halifax Hosp. Med. Ctr.*, 891 F.2d 810, 819 (11th Cir.1990); *see also Crosby v. Hospital Auth. of Valdosta and Lowndes County*, 93 F.3d 1515, 1521 (11th Cir.1996) (noting that while other as-

---

**12.** Plaintiff's second amended compl., filed on Oct. 23, 1997, at ¶ 83.

**13.** *See* defendants' exhibit no. 97, SAMC medical staff by-laws, at 22–23 (providing that the board makes the final decision regarding staff privileges).

pects of the Bolt decision had been implicitly overruled by the Supreme Court, this holding remained the law of the circuit), *cert. denied,* —— U.S. ——, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997). Thus, Marshall may survive summary judgment on his § 1 claim if he can establish that the revocation of privileges stemmed from a concerted action by Planz and the hospital.

However, to prevail on such a claim, Marshall must "demonstrate 'a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'" *Todorov,* 921 F.2d at 1455–56 (quoting *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)). Where a plaintiff cannot point to an explicit agreement among the alleged conspirators, as is the case here, he or she may resort to circumstantial evidence. Under such circumstances, "the plaintiff, to survive a motion for summary judgment, must present evidence that reasonably 'tends to exclude the possibility' that the alleged conspirators acted independently." *Todorov,* 921 F.2d at 1456 (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984)). As the Eleventh Circuit has explained:

> "This means that 'conduct as consistent with permissible [activity] as with illegal conspiracy does not, standing alone, permit the inference of conspiracy.' Thus, when the defendant puts forth a plausible, pro-competitive explanation for his actions, we will not be quick to infer, from circumstantial evidence, that a violation of the antitrust laws has occurred; the plaintiff must produce more probative evidence that the law has been violated."

*Todorov,* 921 F.2d at 1456 (internal citations omitted).

Here, the defendants have proffered as procompetitive reasons for the termination of Marshall's privileges the hospital's concerns about patient safety and staff morale, in view of the lengthy record of complaints against Marshall, as well as the evidence of inadequate care and disruptive behavior uncovered during the peer-review process. Many courts have recognized that by imposing sanctions on physicians who do not satisfy their patient-care requirements hospitals do indeed take steps to enhance, rather than restrict, competition. *See Mathews v. Lancaster General Hosp.,* 87 F.3d 624, 640 (3rd Cir.1996) (noting that "peer review actions, when properly conducted, generally enhance competition and improve the quality of medical care"); *Weiss v. York Hosp.,* 745 F.2d 786, 821 n. 60 (3d Cir.1984) ("It seems obvious that by restricting staff privileges to doctors who have achieved a predetermined level of medical competence, a hospital will enhance its reputation and the quality of medical care it delivers. Thus such action is pro-competitive."); *Oksanen v. Page Memorial Hosp.,* 945 F.2d 696, 709 (4th Cir.1991) (noting that "the peer review process, by policing competence and conduct of doctors, can enhance competition"). That is not to say, though, that Marshall cannot overcome this asserted procompetitive explanation by demonstrating that it is merely a pretext masking a conspiracy between Planz and the SAMC board to restrain trade unlawfully by stripping Marshall of his surgical privileges.

However, the record establishes that Marshall has failed to make a factual showing sufficient to overcome the defendants' asserted procompetitive explanation. Considered in the light most favorable to Marshall, his circumstantial evidence amounts to the following. First, Planz had an economic, anticompetitive incentive to exclude Marshall from the cardiac surgery market in Dothan and its environs. Second, the most effective, and perhaps exclusive, means of ensuring that Marshall could not compete would be to secure the revocation of his surgical privileges at the only two hospitals in the area that supported cardiac surgery, and to do so Planz would need to enlist the aid of officials at SAMC, with whom he had a close association and over whom he could perhaps wield some influence. Third, Planz in fact communicated his desire to exclude Marshall from the market to several individuals associated with SAMC, by seeking assurances from the hospital's then-current chief executive officer that it would support Planz rather than Marshall, and by threatening other hospital officials with adverse consequences should they chose to support Marshall in an independent practice. Fourth, the peer review process contained several deficiencies, including errors in data collection and analysis. Fifth,

and finally, the hospital itself had several economic incentives to side with Planz and strip Marshall of his privileges.[14]

The court finds that this evidence, while it may contain the whisper of a suggestion that SAMC's board conspired with Planz to restrain trade unlawfully by revoking Marshall's privileges, does not even remotely exclude the possibility that the board acted unilaterally and procompetitively in reaching its decision. Most importantly, there is no indication in the record that Planz conspired *with SAMC's board of directors* to secure the revocation of Marshall's privileges. While Planz's meetings with former SAMC chief executive officer James Blackmon may provide, when all inferences are drawn in Marshall's favor, a hint of a conspiracy between Planz and an SAMC official, the record shows that Blackmon was no longer the hospital's CEO when the board decided to revoke Marshall's privileges, and there is no indication that he could have influenced the board's deliberations. Nor does the record reveal any instances in which Planz communicated to hospital board members his desire that Marshall's privileges be revoked or that Marshall be disciplined in any way.[15]

Additionally, even if a conspiracy could be established by showing that Planz conspired with other physicians at SAMC, including those on the peer-review committees, and those physicians in turn conspired with the board to revoke Marshall's privileges, there is no factual support for such a finding. Once again, Marshall can point to no evidence that suggests that the board merely rubberstamped the peer-review committees' recommendation that Marshall lose his privi-

leges, and thus ceded its authority under state law and the hospital's by-laws to decide independently questions of staff privileges.

Thus, the court finds that Marshall has failed to muster sufficient evidence to demonstrate a genuine issue of material fact regarding the existence of a conspiracy between Planz and the hospital board. He has presented no evidence that reasonably tends to exclude the possibility that the board acted independently when it revoked Marshall's surgical privileges. Consequently, Marshall cannot maintain his conspiracy claim under § 1 of the Sherman Act.[16]

Moreover, the court notes that a different outcome could very well be warranted if Planz's alleged misdeeds had so infected the peer-review process and the board of directors' final decision that it was in reality Planz who, wielding undue power over the board, revoked Marshall's surgical privileges. At a hearing held by the court concerning the defendants' summary judgment motion on June 17, 1998, counsel for Marshall colorfully, but aptly, portrayed such a scenario as "Planz put[ting] a gun to the head of the board of the medical center" and forcing the revocation of Marshall's privileges. While the court of course recognizes that the private actor need not actually threaten physical violence to call into question whether the hospital board indeed acted unilaterally, but that raising the specter of severe economic consequences may constitute a sufficient threat, Marshall has not proffered any evidence that would support a reasonable inference that Planz's threats actually subverted the board's independent decision-making process and

---

**14.** These economic incentives include, according to Marshall's antitrust expert, a desire to (1) avoid unwanted price competition imposed by managed health care plans should Marshall establish a competing practice at Flowers hospital, and (2) avert the flight of Planz's practice to Flowers should SAMC side with Marshall and thus alienate Planz. *See* Plaintiff's exhibit no. 1 in opposition to defendants' motion for summary judgment, expert report of David M. Eisenstadt, Ph.D., at 29–30.

**15.** Moreover, 13 of the 14 members of the board that revoked Marshall's privileges have testified during depositions or have stated in affidavits that Planz did not influence their decision to revoke Marshall's privileges. *See* defendants'

memorandum in support of motion for summary judgment, filed on March 18, 1998, at 39–41.

**16.** The court reaches this same conclusion regarding Marshall's § 2 monopolization claim, to the extent he alleges that Planz and the SAMC board conspired to create or maintain a monopoly over cardiac-surgery services. *See Todorov*, 921 F.2d at 1460 n. 35 (observing that § 1 and § 2 conspiracy claims require the same threshold showing of the existence of an agreement to restrain trade, and noting that the court need not address the specific intent element of the § 2 claim where the plaintiff fails to demonstrate a genuine issue of material fact as to the existence of a conspiracy between the defendant physicians and hospital authority).

that it, in effect, shirked its responsibility and acquiesced to Planz's demands for fear of economic retribution or other undesirable consequences.

### D. Attempted Monopolization Under § 2 of the Sherman Act

■ Marshall maintains that even if the revocation of his surgical privileges was the sole cause of his antitrust injuries, the defendants may nonetheless be liable under § 2 of the Sherman Act for attempted monopolization, because he would have suffered a diminution in his practice due to the defendants' anticompetitive conduct even absent the revocation of his privileges. Specifically, Marshall contends that even if he had not been stripped of his privileges there would have been a period of time after the dissolution of his partnership with Planz during which the defendants would have enjoyed a "short-term monopoly" because Planz had so maligned Marshall at the hospital that it would have taken him some time, perhaps a year or two, to reestablish his goodwill among referring physicians and to rebuild his practice. Marshall asserts that the defendants should be held responsible for the damages he would have sustained during that interim period, because it was Planz's anticompetitive conduct and his attempt to monopolize the provision of cardiac-surgery services that would have caused those damages.

■ This effort to salvage Marshall's antitrust lawsuit by resort to the theory of attempted monopoly falters, however, because regardless of whether or not Planz's actions amount to an attempt to monopolize the market in the absence of the revocation of Marshall's privileges, Marshall cannot demonstrate that he suffered any actual injury or damages as a consequence of those actions. As the Eleventh Circuit has explained, there are three essential elements of an attempted monopolization claim under § 2 of the Sherman Act: (1) the defendant must have the specific intent to achieve monopoly power by predatory or exclusionary conduct; (2) the defendant must in fact commit such anticompetitive conduct; and (3) there must have existed a dangerous probability that the defendant might have succeeded in its attempt to achieve monopoly power. *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 993 (11th Cir.1993). However, in seeking damages for attempted monopolization, Marshall relies upon § 4 of the Clayton Act, 15 U.S.C.A. § 15, which provides: "Any person who shall be injured in his business of property by anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." To sustain such a cause of action, Marshall must show: (1) that the defendants' attempted monopolization constitutes a violation of § 2 of the Sherman Act; (2) an injury to his business or property; and (3) a causal relationship between the antitrust violation and the injury. *See National Ind. Theatre v. Buena Vista Distribution,* 748 F.2d 602, 607 (11th Cir.1984). Moreover, "the last two elements require the valuation of the plaintiff's injury in terms of money damages with some degree of certainty." *Id.*

Thus, to prevail on his attempted-monopolization claim, Marshall must demonstrate that Planz's allegedly anticompetitive conduct resulted in an actual injury to his business, and, further, he must proffer evidence that permits the valuation of his injury with some degree of certainty. He fails on both counts. Marshall can point to no concrete injury that he suffered as a consequence of Planz's alleged misconduct, because even if Planz took steps to sabotage any attempt by Marshall to establish an independent practice after dissolution of the partnership between the two physicians, these actions were swiftly rendered superfluous, in view of the fact that Marshall's privileges at SAMC were suspended, and eventually revoked, almost immediately after the partnership ended. Thus, Marshall never had any real opportunity to strike out on his own after he and Planz parted ways, because SAMC's revocation of his privileges, which prompted Flowers Hospital to follow suit, spelled the end of his hopes of practicing cardiac surgery in Dothan.

Therefore, Marshall is unable to demonstrate that he suffered any injury to his business at the hands of the defendants for

the hypothetical interim period that would have existed, absent the loss of his surgical privileges, between the termination of his relationship with SCA and the reestablishment of his medical practice in Dothan. As a consequence, Marshall cannot satisfy the second and third elements of a claim for damages under § 4 of the Clayton Act, and his claim grounded on the defendants' attempted monopolization is due to be dismissed along with his other antitrust claims.[17]

## IV. STATE ANTITRUST CLAIM

Marshall also brings a claim against the defendants grounded on state antitrust law. Specifically, he charges them with having violated 1975 Ala.Code § 6–5–60.[18] Alabama courts interpret this provision in accordance with federal antitrust law. *See Ex parte Rice,* 259 Ala. 570, 67 So.2d 825, 829 (1953) (per curiam) ("The federal statutes ... prescribe the terms of unlawful monopolies and restraints of trade as they should also be administered in Alabama"); *see also Avery Freight Lines, Inc. v. Alabama Pub. Serv. Comm'n,* 267 Ala. 646, 104 So.2d 705, 709 (1958) ("In construing the terms and provisions of Alabama statutes derived from federal statutes, such terms and provisions will usually be considered as having the meaning given by the federal courts"). For the reasons given above regarding the claims for relief under §§ 1 and 2 of the Sherman Act, the court concludes that summary judgment should also be granted as to Marshall's claim under 1975 Ala.Code § 6–5–60.

## V. CONCLUSION

Because the court finds that Marshall has failed to establish that the allegedly unlawful acts he ascribes to Planz actually caused him any antitrust injury, the court will grant summary judgment as to all of his federal and state antitrust claims, which are brought pursuant to §§ 1 and 2 of the Sherman Act, and 1975 Ala.Code § 6–5–60.

Accordingly, it is ORDERED that the motion for summary judgment, filed by defen-

dants Edward Planz, M.D., and Southeastern Cardiovascular Associates, P.C. on March 18, 1998, is granted as to all federal and state antitrust claims asserted by plaintiff William G. Marshall, Jr.

---

**17.** If Marshall were seeking injunctive relief due to the existence of an ongoing or recurring threat of monopoly posed by the defendants' actions, a different analysis would apply. However, because Marshall is now precluded from resuming his practice in Dothan because he does not possess the requisite staff privileges, the defendants no longer pose any threat to his economic interests, and injunctive relief is unavailable.

**18.** *See* plaintiff's second amended compl., filed on Oct. 23, 1997, at ¶¶ 74–78.