William G. MARSHALL, Jr., Plaintiff,

v.

Edward PLANZ, et al., Defendants.

No. CIV. A. 97–T–793–S.

United States District Court,
M.D. Alabama,
Southern Division.

April 9, 2001.

Thomas S. Lawson, Jr., James N. Walter, Jr., Capell & Howard, PC, Montgomery, AL, Jeffrey S. Jacobovitz, Robert A. Jaffe, Kutak Rock, Washington, DC, for William G. Marshall, Jr., M.D., plaintiff.

Kerry Phillip Luke, Edward O. Conerly, Hall, Conerly, Mudd & Bolvig, John F. Mandt, Phillip A. Nichols, Balch & Bingham, Birmingham, AL, Michael Baird Beers, Winston Whitehead Edwards, Beers Anderson Jackson Nelson, Hughes & Patty, PC, Joseph C. Espy, III, A. Lester (Les) Hayes, III, Melton, Espy, Williams & Hayes, P.C., Montgomery, AL, Paul G. Smith, Matthew C. Williams, Smith, Spires & Peddy, Birmingham, AL, for Edward Planz, M.D., Southeastern Cardiovascular Associates, P.C., defendants.

## OPINION

MYRON H. THOMPSON, District Judge.

In this lawsuit, plaintiff William G. Marshall, Jr., M.D., asserts state-law defamation claims against defendants Edward Planz, M.D. (his former business partner), and Southeastern Cardiovascular Associates (a corporation of which Marshall was formerly a shareholder and employee). This matter is currently before the court on (1) motions by defendants [1] and nonparty Southeastern Alabama Medical Association (SAMC),[2] each invoking Alabama's statutory "peer review" privilege, codified at 1975 Ala.Code §§ 6–5–333 and 22–21–8, to prevent testimony at trial; and (2) several related evidentiary and procedural matters raised by the parties as a result of these privilege assertions.[3] Al-

---

1. Defendants' motion filed on March 7, 2001 (Doc. no. 296).

2. SAMC's motion filed on February 28, 2001 (Doc. no. 263).

3. Section 22–21–8 provides:
 "Confidentiality of accreditation, quality assurance credentialing materials, etc.
 (a) Accreditation, quality assurance and similar materials as used in this section shall include written reports, records, correspondence, and materials concerning the accreditation or quality assurance or similar function of any hospital, clinic, or medical staff. The confidentiality established by this section shall apply to materials prepared by an employee, advisor, or consultant of a hospital, clinic, or medical staff and to materials prepared by an employee, advisor or consultant of an accrediting, quality assurance or similar agency or similar body and to any individual who is an employee, advisor or consultant of a hospital, clinic, medical staff or accrediting,

though the movants differ somewhat with respect to their factual situations, they each raise the same legal issue: whether Alabama's statutory peer review privilege prevents disclosure of particular testimony at trial. Defendants move to assert the privilege on behalf of Planz. SAMC moves to assert the privilege on behalf of all its present and former employees. In several hearings and conferences on the

quality assurance or similar agency or body.

(b) All accreditation, quality assurance credentialing and similar materials shall be held in confidence and shall not be subject to discovery or introduction in evidence in any civil action against a health care professional or institution arising out of matters which are the subject of evaluation and review for accreditation, quality assurance and similar functions, purposes, or activities. No person involved in preparation, evaluation or review of accreditation, quality assurance or similar materials shall be permitted or required to testify in any civil action as to any evidence or other matters produced or presented during the course of preparation, evaluation, or review of such materials or as to any finding, recommendation, evaluation, opinion, or other action of such accreditation, quality assurance or similar function or other person involved therein. Information, documents, or records otherwise available from original sources are not to be construed as being unavailable for discovery or for use in any civil action merely because they were presented or used in preparation of accreditation, quality assurance or similar materials nor should any person involved in preparation, evaluation, or review of such materials be prevented from testifying as to matters within his knowledge, but the witness testifying should not be asked about any opinions or data given by him in preparation, evaluation, or review of accreditation, quality assurance or similar materials."

Section 6–5–333 provides in part:

"Dentists, chiropractors, and physicians serving on utilization and quality control committees, peer review committees, or professional standards review committees; consultants thereto and employees thereof; dental, chiropractic and medical societies and associations; appeal to Alabama Dental Association; confidentiality.

(a) Any dentist, chiropractor, or physician licensed to practice medicine in Alabama who serves on a peer review or a utilization and quality control committee or professional standards review committee or a similar committee or a committee of similar purpose or any dentist, physician, chiropractor, or individual who serves as a consultant or employee to one of said committees ... to review any aspect of ... medical care ... shall not be liable to any person for damages as a result of any action taken or recommendation made by him within the scope of his function as a member of or employee or consultant to such review committee if such action was taken or recommendation made without malice and in a reasonable belief that such action or recommendation is warranted by the facts made known to him. . . .

(b) Within the words and meaning of this section, a "committee" shall mean members of a committee of dentists, chiropractors, or physicians licensed to practice medicine in Alabama formed or appointed to evaluate the diagnosis or the performance of services of ... physicians licensed to practice medicine in Alabama. . . .

. . . . .

(d) All information, interviews, reports, statements, or memoranda furnished to any committee as defined in this section, and any findings, conclusions, or recommendations resulting from the proceedings of such committee are declared to be privileged. The records and proceedings of any such committees shall be confidential and shall be used by such committee and the members thereof only in the exercise of the proper functions of the committee and shall not be public records nor be available for court subpoena or for discovery proceedings. Nothing contained herein shall apply to records made in the regular course of business by a hospital, ... physician, physician auxiliary personnel, or other provider of health care and information, documents, or records otherwise available from original sources are not to be construed as immune from discovery or use in any civil proceedings merely because they were presented during proceedings of such committee."

Defendants also assert the applicability of 1975 Ala.Code § 34–24–58, but the court finds it inapplicable on these facts.

peer review issue, the availability of the testimony of Dr. Wayne Hannah, SAMC medical director, has become a central issue because four of the five allegedly defamatory statements were conveyed by Planz to Hannah. Because the facts as they pertain to Planz and Hannah are interrelated, the court addresses Planz and Hannah together here.

The parties dispute whether either statute applies to Planz or Hannah. This disagreement is well-taken, for, as the following discussion shows, neither the statutes nor Alabama cases interpreting them provide clear guidance on these facts. There are essentially two issues in dispute: (1) the scope or reach of the peer review process that is covered by the statutes; and (2) the availability of an exception to the privilege for statements made without reasonable belief of their truth or made with actual malice. Marshall argues for a limited formal understanding of peer review, which under the present facts would not extend the privilege to either Planz or Hannah. He also argues that because Planz made his statements either without a reasonable belief that they were true or with actual malice, they are outside the scope of the statutes.

In earlier summary orders rejecting Marshall's arguments on these two and other issues, the court granted Planz's motion as to all statements at issue except the one he made to Dr. James York, and the court granted SAMC's motion as to all statements at issue except the aforementioned statement by Planz to York, and republication by Hannah to other members of the SAMC staff of allegedly defamatory statements by Planz to him.[4] The court promised that a memorandum opinion in support of the orders would follow, and this is the promised opinion.

## I. BACKGROUND

Marshall's lawsuit against Planz stems from Marshall's loss of surgical privileges at SAMC and Flowers Hospital in Dothan, Alabama, in 1997. Marshall asserted claims grounded on §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C.A. §§ 1 and 2, and § 4 of the Clayton Act, 15 U.S.C.A. § 15, as well as numerous state-law claims, namely defamation, tortious interference with business and contractual relations, breach of contract, monopolization, and civil conspiracy. The facts leading to the suspension, and ultimate termination, of Marshall's surgical privileges, are given in some detail in *Marshall v. Planz*, 13 F.Supp.2d 1231 (M.D.Ala.1998) (Thompson, J.), and will not be repeated here in full. Suffice it to say that after extensive peer review investigations and hearings, SAMC terminated Marshall's hospital privileges "on the basis of disruptive and abusive behavior associated with personnel involved in patient care with implications of adverse effect on the quality of patient care," and Flowers Hospital followed suit.

Through a series of orders, the court whittled down Marshall's lawsuit to his state-law claims for defamation, and narrowed these claims to five statements that Planz allegedly made during the brief period from November to December 1996, just before SAMC's suspension of Marshall's surgical privileges in January 1997; and, because Marshall cannot recover any damages that flowed from his suspension and later termination, the court also limited his recoverable defamation damages to this brief period. The five statements Marshall accuses Planz of making during the months of November and December 1996 are the following:

---

4. *See* Orders of March 15 and 16, 2001 (Doc nos. 316 & 329).

"[1] Dr. Marshall had severe back problems that prevented him from operating safely (at least 3 statements to Dr. Wayne Hannah, SAMC's medical staff director, Dr. James York, an anesthesiologist who was scheduled to provide services to Dr. Marshall's patients, and Dr. Richard Davis, a doctor with the American Medico–Legal Foundation that was reviewing SAMC's cardiac surgery program).

"[2] Dr. Marshall may be suicidal or out of touch with reality and that Dr. Marshall had a significant personality disorder (at least 2 statements to Dr. Wayne Hannah, SAMC's medical staff director, and Dr. Richard Davis, a doctor with the American Medico–Legal Foundation that was reviewing SAMC's cardiac surgery program).

"[3] Dr. Marshall had been suspended from his medical residency program for six months, when he had only taken a one week leave (statement to Dr. Richard Davis, a doctor with the American Medico–Legal Foundation that was reviewing SAMC's cardiac surgery program).

"[4] A quality of care statement that Dr. Marshall did not have the capacity to voluntarily agree to stop surgery (statements to Dr. Wayne Hannah, SAMC's medical staff director, and other members of SAMC's E&C committee); and

"[5] A quality of care statement that Dr. Marshall was hurting inside and really wants someone to make him stop (statements to Dr. Wayne Hannah, SAMC's medical staff director, and other doctors)."

Order on pretrial hearing, entered February 7, 2001, at 3–4.[5] To succeed on a claim of defamation, Marshall must prove, among other things, that the statement was "published," that is, communicated to another individual. *See Walton v. Bromberg & Co., Inc.,* 514 So.2d 1010, 1011 (Ala.1987). For every witness who can invoke the privilege, Marshall has one fewer witness to establish the publication element of his cause of action.

Whether testimony from Planz and Hannah can be excluded under either or both of Alabama's peer review statutes, § 22–21–8 or 6–5–333, ultimately depends on the application of these statutes in the context in which the statements were made. During the period in question, Hannah was medical director of SAMC. In that position, he served as an ex officio member of SAMC's peer review committees.[6] Planz was a cardiovascular surgeon with surgical privileges at SAMC and Flowers Hospital. He was not an employee of either institution.

The parties agree that Planz was not an official member of a standing SAMC peer review committee as defined by either §§ 6–5–333 or 22–21–8. With respect to the events leading up to Marshall's January 1997 suspension from SAMC, though, Planz was well aware that a peer review process was underway to examine cardiovascular surgery at SAMC generally, and the practices of Marshall in particular. Planz and Marshall were business partners in Southeastern Cardiovascular Associates. Along with a third partner, Marshall and Planz were the exclusive providers of cardiac surgery services at SAMC and Flowers Hospital. During the summer of 1996, SAMC became concerned with increased morbidity and mortality rates in cardiac surgery. On July 23, 1996, Dr. George Veale, chairman of the SAMC Quality/Risk

**5.** Doc. no. 232.

**6.** *See* Bylaws of the Southeast Alabama Medical Center.

Management Committee—a peer review committee under Alabama's peer review statutes—asked both Marshall and Planz, among others, to participate in an "ad hoc committee" to review the increase in the number of unexpected deaths resulting from cardiac surgeries. That committee met on September 17, 1996.

Meanwhile, on August 13, 1996, the SAMC Executive and Credential Committee (E&C Committee), also a peer review committee under Alabama's peer review statutes, decided to employ outside consultants, the American Medico–Legal Foundation (AMLF), to conduct an independent clinical review of the hospital's provision of cardiac care.[7] On October 23, 1996, following the report of the ad hoc committee, but before AMLF issued its report, the E&C Committee voted to have Planz proctor Marshall until the results of the AMLF review were presented. Marshall did not accept the proctorship, but instead challenged the methodology of the peer review process by arguing that his mortality and morbidity rates were elevated because he operated on higher risk patients.

This series of events demonstrates that although Planz was not an official member of a standing peer review committee, he did participate in a peer review of cardiovascular surgery in the summer and fall of 1996. Admittedly, Planz has testified that in his opinion he "had no input into ... Peer Review per se," Planz Dep. at 203–04; nonetheless, there is no doubt that Planz was aware of SAMC's concerns about mortality and morbidity rates for cardiovascular surgery, and that by the end of 1996 those concerns had begun to focus on Marshall.

Hannah's position with respect to the peer review process is factually different from Planz's. Hannah was an ex officio member of the E&C Committee, and a member of both the standing Quality/Risk Management Committee and the ad hoc committee convened to evaluate cardiovascular surgery. Marshall argues, though, with respect to Hannah, that the statements in question were made when Hannah was not acting in his capacity as a peer review committee member. He further argues that Hannah's communication of Planz's statements to nurse supervisors and the chief executive officer of the hospital were also outside his role on the peer review committees. Defendants and SAMC contend that any statement made to Hannah, whether in a formal committee setting or not, as well as actions taken in response to that statement to address quality of care concerns, were essentially for the purpose of peer review and are covered.

## II. DISCUSSION

### A. Scope of Peer Review Covered by the Statutes

As the Eleventh Circuit Court of Appeals has observed, "Peer review, the process by which physicians and hospitals evaluate and discipline staff doctors, has become an integral component of the health care system in the United States." *Bryan v. James E. Holmes Reg'l Medical Ctr.*, 33 F.3d 1318, 1321 (11th Cir.1994). The federal government, through the Health Care Quality Improvement Act, 42 U.S.C.A. §§ 11101–11152, and state governments have enacted statutory frameworks "to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofes-

---

7. The AMLF review was conducted by Drs. Richard Davis, Robert Wallace, and John L. Ochsner.

sional behavior." H.R.Rep. No. 903, 99th Cong., 2d Sess. 2, reprinted in 1986 U.S.C.C.A.N. 6287, 6385 (legislative intent of Health Care Quality Improvement Act). Federal and state statutes provide, to varying degrees, immunity from liability in civil actions for actions of peer review committees and confidentiality for information shared with and in those committees. *See, e.g.*, 42 U.S.C.A. § 11111 (limiting liability for physicians in peer review); § 11137 (establishing confidentiality for peer review information); 1975 Ala.Code §§ 6–5–333, 22–21–8, 34–24–58 (establishing privilege from disclosure and limitations on liability); *see also* Charles David Creech, Comment, *The Medical Review Committee Privilege: A Jurisdictional Survey*, 67 N.C. L.Rev. 179 (1988). In doing so, the intent of these statutes is "to facilitate the frank exchange of information among professionals conducting peer review inquiries without the fear of reprisals in civil lawsuits." *Bryan*, 33 F.3d at 1322; *accord Ex parte Krothapalli*, 762 So.2d 836, 838 (Ala. 2000) (" 'In order to make meaningful peer review possible, the legislature provided a guarantee of confidentiality for the peer review process. . . .' ") (quoting *Cruger v. Love*, 599 So.2d 111, 113–14 (Fla.1992)); *McGee v. Bruce Hosp. Sys.*, 312 S.C. 58, 439 S.E.2d 257, 259–60 (1993) ("The underlying purpose behind the confidentiality statute is not to facilitate the prosecution of civil actions, but to promote complete candor and open discussions among participants in the peer review process.")

The question here is one of scope: in what situations does Alabama's peer review privilege apply. The plain language of Alabama's two statutes, §§ 6–5–333 and 22–21–8, provides some guidance on these facts. Section 6–5–333(d) declares as privileged "all information, interviews, reports, statements, or memoranda furnished to any committee as defined in this section. . . ." A committee is defined as a committee of physicians (or other enumerated health professionals not relevant here) "formed or appointed to evaluate the diagnosis or the performance of services" of other medical personnel. 1975 Ala.Code § 6–5–333(b). Because the statute covers information "furnished to" a committee, its protection extends beyond the committee and committee members themselves and, to some degree, applies to outside individuals who give information to the committee.

Similarly, § 22–21–8 provides that "no person involved in preparation, evaluation or review of accreditation, quality assurance or similar materials shall be permitted or required to testify in any civil action as to any evidence or other matters produced or presented. . . ." This privilege applies to both documents and testimony presented to or gathered by a peer review committee. *See Ex parte Burch*, 730 So.2d 143, 149 (Ala.1999) (finding testimony of a peer review committee chairman privileged.)

With respect to the kinds of evidence protected from production in civil cases, the statutory language is broad. Section 6–5–333 applies to "information . . . furnished to" a committee; § 22–21–8 applies to information obtained through "involvement . . . in the preparation" of committee materials. The question that no Alabama court has addressed in a way relevant to this case is how far the notion of peer review committee extends. In other words, though a statement by one physician about another's performance may be covered, it still remains to be determined whether a particular statement was "furnished to" to a peer review committee or was made as part of the preparation of peer review materials as considered by the statutes.

The few Alabama cases construing the peer review privilege considered requests by litigants who sought information requested by or presented to a formal meet-

ing of a peer review committee, or sought testimony from a member of a peer review committee. *See Kingsley v. Sachitano*, 783 So.2d 824 (Ala. 2000) (documents used in the peer review process privileged); *Ex parte Krothapalli, supra* (§ 22–21–8 covers a physician's application for staff privileges); *Ex parte Burch, supra* (seeking testimony from physician-chairperson of hospital's medical review committee); *Ex parte Qureshi*, 768 So.2d 374 (Ala.2000) (finding privilege extended to documents considered by the hospital in hiring a physician); *Ex parte St. Vincent's Hosp.*, 652 So.2d 225 (Ala.1994) (denying privilege to documents of the infection control committee with no evidence that the committee was related to peer review.) These cases provide little help for situations where, as here, the very boundaries of peer review are disputed.

■ The Alabama Supreme Court has, however, established a background against which the peer review statutes should be interpreted. In *Ex Parte Krothapalli*, that court adopted the rationale of the Florida and South Carolina Supreme Courts, finding that "the policy of encouraging full candor in peer review proceedings is advanced only if all documents considered by the committee or board during the peer review or credentialing process are protected.... Committee members, *and those providing information to the committee* must be able to operate without fear of reprisal." 762 So.2d at 838 (emphasis added) (quoting *Cruger v. Love*, 599 So.2d 111, 113–14 (Fla.1992)). In other words, to achieve full candor, the Alabama Supreme Court has concluded that the legislature intended the process of information gathering, as well as the discussion of and decisions based on that information, is protected by the peer review privilege. In particular, this reading of the legislative intent finds support in the "information

... furnished to" language of § 6–5–333(d).

■ In light of this policy, this court concludes that in some situations the privilege should be extended to a physician who provides information to a peer review committee, but who is not an official member of it. This application of the privilege best achieves the purpose of the privilege as expressed by the Alabama Supreme Court. Indeed, the few state courts that have addressed this issue have agreed that the policy of promoting candor is served by extending the privilege outside the formal committee setting. *See, e.g., Brem v. De-Carlo, Lyon, Hearn, & Pazourek, P.A.*, 162 F.R.D. 94 (D.Md.1995) (extending privilege to testimony given by a physician at an "error management conference" even though the conference was not part of a formal proceeding held by a peer review or quality assurance committee); *Ray v. St. John's Health Care Corp.*, 582 N.E.2d 464, 472 (Ind.Ct.App.1991) (protecting "all communications relating to the review of patient care, whether they are formally made in review proceedings or made in private in such a way as to shape the opinions of the persons charged with peer review"); *County of Los Angeles v. Superior Court of Los Angeles County*, 224 Cal.App.3d 1446, 274 Cal.Rptr. 712 (1990) (finding statutory privilege applied to testimony by doctors about their comments in weekly departmental meeting held to improve patient care). These cases convince this court that it is not the formality of the process in which the information is conveyed, but rather the full context of the conveyance, which determines whether information furnished to a peer review committee should or should not be privileged under the statutes. With this in mind, the court turns to each of the statements at issue.

■ *Statement three: Planz's representation to Davis, the AMLF consultant, that Marshall had been suspended from his medical residency program for six months.* This statement presents the easiest situation. By order entered on March 5, 2001, this court has already found that "no statements were made to or by [Davis] outside the peer review process."[8] Planz made his statement to Davis in an interview conducted by Davis as part of the AMLF review. There is no question that when Planz was interviewed by Davis, he was furnishing information to a consultant working for a peer review committee. His statement to Davis is privileged.

■ *Statements four and five: Planz's representation to Hannah and others that Marshall "did not have the capacity to voluntarily agree to stop surgery" and "was hurting inside and really wants someone to make him stop."* These statements occurred at the same time and in the same context: by Planz to Hannah, Dr. Ross Clifton, and hospital administrator Ronnie Dean, on January 3, 1997. Planz called the meeting to discuss concerns he had about Marshall's medical judgment. Specifically, Planz was prompted by Marshall's treatment of a patient that morning. The circumstances of the meeting, along with the nature of the information conveyed, lead the court to conclude that Planz intended to furnish information to appropriate hospital officials so that it could be taken into account in the review of Marshall's performance. Planz acted quickly and contacted appropriate individuals. He was aware of Marshall's physical health issues, of concerns of others about Marshall's performance, and that these concerns remained unresolved. Accordingly, Planz can invoke the privilege with respect to statements he made in the Jan-

uary 3 meeting (which was, in fact, on the same day SAMC finally decided to suspend Marshall). This finding necessarily requires the court to conclude that Hannah can also invoke the peer review privilege as to statements made in his January 3 meeting with Planz.

■ *Statement two: Planz's statement that Marshall "may be suicidal or out of touch with reality."* For this November 1996 statement he made to Hannah, Planz is entitled to invoke the peer review privilege as well. Again, the context is dispositive. Even though Planz did not state that he was calling Hannah in Hannah's capacity as medical director, or explain that his specific purpose was to lodge a quality-of-care complaint with the appropriate peer review committee, so much is clear from the context of the conversation. Planz contacted Hannah because he thought Hannah would be able to determine if the information was important, and refer Marshall to help if necessary.[9] In addition, by this point Planz knew that SAMC had quality-of-care concerns about Marshall; he knew that the E&C Committee had recommended that he proctor Marshall; and he knew that Hannah was involved with Marshall's peer review. To conclude that this was not part of peer review as contemplated by the statute would be to exalt form over function.

■ Whether Hannah can be called to testify about his republication of these statement presents a different question. It is undisputed that after hearing from Planz that Marshall was suicidal, Hannah conveyed this information to two nursing supervisors and to Fred Pelle, chief executive officer of SAMC. Marshall argues that these statements were outside the peer review process because they were made to

**8.** Doc. no. 281.

**9.** *See* Planz Dep. at 124.

individuals with no involvement in a peer review committee. Hannah now states that, in light of the present motions, "[a]ny restatement to other persons of such information given to me by Dr. Planz was for the purpose of carrying out quality assurance and/or peer review functions." [10]

Whether a member of a peer review committee can invoke the statutory privilege against testifying for *actions* he took in response to information furnished to a covered committee has also not been addressed by the Alabama courts. There is no language in the Alabama statutes that would cover this situation. Clearly, the actions taken by Hannah in response to the statements made by Planz are not information furnished to the committee, nor are they, under these facts, a decision made by the committee. Although it is reasonable to expect someone in Hannah's position to notify some members of the medical staff of concerns raised to him about the performance of a physician, the communication of that concern does little to encourage full candor in the peer review proceedings.

Of course, if in response to his communication Hannah received a report back of relevant information relevant to peer review, that report may be privileged; but that situation is not before the court. Adopting SAMC's interpretation of the privilege could extend the privilege to statements pertaining to most every act taken by someone in Hannah's position. This would be beyond the language and intent of the statute, and on the record before the court, cannot be justified.

■ *Statement one: Planz's November 1996 statement to Dr. York that "Dr. Marshall had severe back problems that prevented him from operating safely."* This statement falls outside the peer review privilege. York was scheduled to serve as anesthesiologist for Marshall during surgery, but became concerned that Marshall's back condition would prevent him from operating safely. In response to an inquiry by York about Marshall's ability to perform surgery, Planz stated that Marshall had "pain and tingling in his arms." [11] He offered no other opinion as to Marshall's fitness. Unlike the prior statements, this statement was not made to an individual either on or working for a peer review committee. York was simply a physician with, to the court's knowledge, no previous involvement with Marshall's peer review. According to York's affidavit, he first became aware of Marshall's back condition the same weekend that he raised his concerns to Planz. [12] Of course, one reasonable reading of the facts is that Planz gave relevant information to a doctor who expressed professional concerns about the condition of a surgeon whom he would be assisting in surgery. But the *statutory* peer review privilege does not to apply a statement made by one doctor to another outside the peer review process. To apply the peer review privilege to testimony about this statement would require the court to abandon any distinction between a conversation between doctors and a peer review process. Accordingly, Planz cannot assert the peer review privilege to avoid testifying as to this statement. [13]

---

10. *See* Aff. of C. Wayne Hannah, filed March 7, 2001.

11. *See* Aff. of James K. York.

12. *See id.*

13. Marshall contends that any finding by this court that Planz can assert peer review privilege contradicts the law of the case, in particular an earlier finding by Magistrate Judge Coody, as a part of a discovery dispute, that "Planz was not a member of the peer review committee." *See* Order of September 10, 1997 (Doc. no. 22). That particular finding comes in Magistrate Judge Coody's discussion of the federal peer review privilege under the

Marshall argues the court cannot conclude that the privilege applies to Planz without flatly contradicting its earlier order dismissing his antitrust claims. No such contradiction exists. As the court has previously noted, an antitrust claim could have been valid had the evidence supported one of two scenarios: (1) that Planz's alleged misdeeds had so infected the peer-review process and the board of directors' final decision that it was in reality Planz who, wielding undue power over the board, revoked Marshall's surgical privileges; or (2) that Planz and the hospital board had conspired to revoke the privileges, so that the board had not in fact acted unilaterally and independently in reaching its decision. *See Marshall v. Planz*, 13 F.Supp.2d 1231, 1244–45 (M.D.Ala.1998) (Thompson, J.). Finding now that Planz's statements were directed to a peer review committee does not transform what he did into an *infection* of the peer review process, or a *conspiracy* with the hospital board. Instead, a reasonable reading of the facts leads to the conclusion that Planz made statements to Hannah to inform him of what he thought was information the peer review process should know. From that point, the relevant peer review committees—of which Planz was not a member—made the decision to suspend and ultimately fire Marshall. There still is no evidence that Planz so influenced the peer review process that he should be held legally responsible for its actions.

Marshall also argues that Planz's statements fall within the "original source" exception to the privilege. Under both §§ 22–21–8(b) and 6–5–333(d), information which is available from an original source remains discoverable and does not become privileged merely because it was presented to a peer review committee. Marshall argues that because Planz's statements are that which is actionable in this case, Planz cannot "hide" them by invoking the peer review privilege. Marshall's interpretation of the original source exception, however, would amount to an end-run around the purpose of the statutes—to promote full candor in the peer review process. No harm is done to that goal by expressly limiting the scope of the privilege to exclude documents otherwise available to a litigant; in contrast, if statements made by a physician to a member of a peer review committee in light of an ongoing review were not privileged, that physician would be forced to consider the risk of liability when sharing information with the committee. The Alabama legislature intended to eliminate that risk by enacting the statutory peer review privilege.

To reiterate, the court's conclusion rests on two grounds: (1) the broad understanding that the Alabama Supreme Court and other courts have adopted for peer review statutes; and (2) the fact that Planz was aware of, and had participated in, peer review activities concerning cardiovascular surgery during 1996.[14] It is also important to note that the court has not concluded on the basis of §§ 22–21–8 and 6–5–333

Health Care Quality Improvement Act. Even if this finding applies generally to Planz, it still does not contradict this court's conclusions because the court does not conclude Planz was a member of a peer review committee, but that statements made by him to Hannah and Davis are covered by Alabama's peer review privilege.

14. This finding distinguishes the present case from *Century Medical Centers, Inc. v. Marin*, 686 So.2d 606, 608 (Fla.Dist.Ct.App.1996), which Marshall cites for the proposition that a complaint about a physician's performance is *not* privileged unless made directly to the peer review committee. The complaint in *Marin* was made by a patient to the hospital generally. Here, Planz made all but one of

that Planz is immune to suit. Although he may be effectively immune because all those who could testify to publications of the allegedly defamatory statements are privileged from testifying, the court's decision does not rely upon any section of the statutes that extends immunity from civil liability to members of peer review committees. *See* 1975 Ala.Code § 6–5–333(a).

## B. Reasonable Belief and Malice

Notwithstanding the conclusion above concerning the breadth of peer-review-privilege protection, Marshall further argues that the privilege is defeated when statements are made without reasonable belief as to their truth or with malice. In effect, Marshall interprets the privilege from testifying to be a qualified one that can be defeated when the maker of the statement is not acting in good faith.

■ The plain language of the statutes does not support Marshall's argument. Section 22–21–8 makes no mention of malice at all, and § 6–5–333(a) provides a malice exception that is limited to claims of liability against a member of a peer review committee "as a result of any action taken or recommendation made by him within the scope of his function as a member of or employee or consultant." In other words, the reasonable-belief and malice exceptions of § 6–5–333 apply to only liability, not to the privilege from testifying in a civil case, as asserted here.

Marshall marshals support for his position by directing the court to several cases in other States which have found that a reasonable-belief or malice exception does apply to peer review privilege. The problem for Marshall with each of the cases he cites is that the statutory language in question explicitly provides for some sort of good-faith exception. *See Smith v. Farha,* 266 Kan. 991, 974 P.2d 563 (1999) (finding privilege for statements made by a peer review committee member could be overcome by showing actual malice where the statute requires acts be taken in "good faith and without malice"); *Sharpe v. Worland,* 137 N.C.App. 82, 527 S.E.2d 75 (2000) (noting that the North Carolina peer review statute extends the privilege from being subpoenaed in a civil case to "good-faith" participants in the peer review process); *White v. Cassady,* 1992 WL 884790 (Va. Cir. Ct.) (finding not all materials in peer review privileged where the peer review statute allowed the privilege to be defeated "after a hearing and for good cause arising from extraordinary circumstances").[15]

The Pennsylvania case of *Steel v. Weisberg,* 368 Pa.Super. 590, 534 A.2d 814 (1987), provides the most support for Marshall's position. There, a dentist brought a defamation action based on a letter written by a fellow dentist to a peer review committee criticizing him. After concluding that the letter fell within the scope of

his statements to a member of a peer review committee with knowledge of the ongoing review. Thus, his statements are more akin to complaints made to a peer review committee, which are privileged under Florida law. *See* 686 So.2d at 608 n. 2.

**15.** Marshall also cites *Hirsch v. Cooper,* 153 Ariz. 454, 737 P.2d 1092 (1986), for the proposition that a conditional privilege (that is, one bounded by a good-faith requirement) is

appropriate, especially in a defamation action. That case construed Arizona's statute establishing a physician's duty to report another doctor's misconduct or incompetency, Ariz.Rev.Stat. § 32–1451(A), not its peer review statute, Ariz.Rev.Stat. § 36–445.01. *Hirsch* provides no assistance to Marshall because the issues raised here address the particular policy concerns of peer review processes.

the peer review process as defined by statute, the court went on to find that "the legislature did not intend to provide unlimited protection to persons giving testimony or providing information to peer review organizations." 534 A.2d at 818. Although § 4 four of the State's Peer Review Protection Act (63 Pa. Cons.Stat. § 425.4) did not require the statement to be made with reasonable belief or without malice, the court relied on § 3 of the statute, which did provide such an exception for the purposes of liability. Concluding that allowing a defendant to adopt the privilege would "serve to protect from civil liability those persons who knowingly provide [a peer review] committee with false information," the court required the chairman of a peer review committee to divulge the content of the letter. *Id.* at 819.

Like the Pennsylvania law, § 6–5–333(a) does have an exception for actions taken in bad faith, but it applies only to "any action taken or recommendation made by [a member of a peer review committee] within the scope of his function [on the committee]." Unlike the Pennsylvania law, § 6–5–333 does not apply to persons "providing information to any review organization," 63 Pa. Cons.Stat. § 425.3, and to that extent does not contemplate any limitation of the privilege for providers of information. Indeed, the legislative history of Pennsylvania's Peer Review Protection Act indicates that this language was adopted for the express purpose of preventing the potential misuse of "the peer review process to make false charges against the person subject to review." *Sanderson v. Frank S. Bryan, M.D., Ltd.,* 361 Pa.Super. 491, 522 A.2d 1138, 1142 (1987). The analysis used by the *Steel* court, though compelling, is inapposite given the differences between Pennsylvania and Alabama law. Alabama has seen fit to establish only a good-faith exception for actions or recommendations of peer review committees.

This court is persuaded that the approach taken by courts in Colorado and Indiana is more appropriate in light of the plain text of their statutes. Courts in those States refused to read into their peer review statutes a good-faith limitation to the privilege from testifying in a civil case where the privilege from testifying was not qualified, but immunity from suit was. *See, e.g., Franco v. District Court,* 641 P.2d 922 (Colo.1982); *Terre Haute Reg'l Hosp., Inc. v. Basden,* 524 N.E.2d 1306 (Ind.Ct.App.1988). As the *Franco* court noted:

> "That the legislature was aware of its right to limit the privilege to good faith actions is obvious from the statutory immunity limitations. We believe the legislature deliberately omitted any good faith limitation in the peer review privilege in order to avoid any chilling effect on the review committee's statutory duty to openly, honestly and objectively study and review the conduct [or] practice by members of the profession."

641 P.2d at 930.

The difficulty this court therefore has accepting Marshall's argument is that it has no support in the text of Alabama's statutes. Although other States have seen fit to adopt a good-faith requirement for the peer review privilege as it applies to testimony in a civil action (in addition to privilege from liability), Alabama has not. Further, aside from one Pennsylvania court, the court is not aware of any case in which a court has read into a statutory peer review privilege a requirement of reasonable belief or good faith, no less a federal court interpreting state law. Because such a good-faith requirement has

been adopted elsewhere, and the Alabama legislature has not seen fit to adopt one that would apply to the facts of the present case, this court will not read such a requirement into the law.[16]

Contrary to Marshall's assertion otherwise, this finding does not contradict the court's earlier order that Marshall could establish defamation if he were able to show actual malice.[17] With respect to liability, Planz is covered by a qualified privilege only. *See Marshall v. Planz*, 13 F.Supp.2d 1246, 1252 (M.D.Ala.1998) (Thompson, J.). In the court's earlier orders, the statutory peer review privilege from testifying was not raised. And here, the correctness of this court's application of qualified immunity to the issue Planz's liability is not challenged. Thus, no contradiction exists.

## C. Other Issues

### 1. Waiver of the privilege

Application of the privilege notwithstanding, Marshall argues under two theories that Planz's and SAMC's right to claim the peer review privilege has been

waived: (1) neither Planz nor the witnesses covered by the SAMC motion invoked the privilege when they gave their deposition testimony; and (2) with respect to Planz only, the privilege was not raised in the pretrial order. The parties do not dispute these facts. The court finds no one waived the privilege.

### a. Waiver for failure to raise during depositions

■ The failure of witnesses to raise the peer review privilege during depositions can be understood only in the context of the order entered by Magistrate Judge Charles Coody on SAMC's motion to quash subpoena, filed August 15, 1997.[18] In that motion, SAMC asserted §§ 6–5–333(d) and 22–21–8(a)–(b), as well as 1975 Ala.Code § 34–24–58(a), to protect all materials pertaining to quality assurance, peer review, and credentialing. At the time the motion was considered, there were still federal antitrust claims in the case. Accordingly, pursuant to Fed. R.Evid. 501,[19] Judge Coody concluded "that the paramount federal interest of determining the merits of Dr. Marshall's Sherman Act claim supersedes any inter-

---

**16.** Marshall argues that this result is absurd because the policy of encouraging candor in the peer review process cannot be aided by protection of false or malicious statements. As the decisions of the *Franco* and *Basden* courts demonstrate, however, some courts and legislatures have concluded that an absolute privilege from giving evidence from a peer review process in a civil case is necessary to achieve the policy goals behind the peer review privilege. In any event, if this result is absurd, the absurdity is an issue for the Alabama legislature, not the courts, to address and correct.

**17.** *See Marshall v. Planz*, 13 F.Supp.2d 1246, 1252–53 (M.D.Ala.1998) (Thompson, J.).

**18.** Doc. no. 13.

**19.** Rule 501 provides:

"Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law."

est that SEAMC may have in maintaining confidentiality of the information."[20]

It is not disputed that Rule 501 no longer prevents the application of the state-law peer review privilege now that Marshall's antitrust claims have been dismissed on summary judgment. *See Marshall v. Planz*, 13 F.Supp.2d 1231 (M.D.Ala.1998) (dismissing federal and state antitrust claims). After that, only state-law claims remained in the case. But at the time the depositions were taken, Judge Coody's privilege ruling was still in effect. Granted, the SAMC motion to quash pertained to written documents only, but at the time the motion was made, SAMC was faced with a request for only written documents. Marshall nonetheless sought deposition testimony that covered information ultimately covered by the peer review privilege.

It would be manifestly unfair to Planz and other witnesses covered by the peer review privilege to find that their failure to raise the privilege during their depositions waived their right to do so now. There is no reason to think that Judge Coody's ruling would have treated documents and deposition testimony differently had the issue of deposition testimony been before him. Thus, it was reasonable for Planz and the other witnesses to conclude that a peer-review-privilege objection was meritless so long as Judge Coody's order controlled, and reasonable for them not to object during their depositions.

■ Also, it is reasonable to conclude that an individual who is merely in some way connected to the peer preview process should not have the unfettered discretion to waive the peer review privilege under Alabama law. It is generally accepted that "the privilege of nondisclosure of confidential communications is a privilege which may be waived by the person in whose favor it exists." 81 Am.Jur.2d *Witnesses* § 294 (1992). The peer review privilege exists to protect the interests of not just one person but rather the *entire* peer review process (which exists not just for physicians but rather to improve the quality of medical care for all) and *all* those involved, including peer review committees, physicians who participate in them, and others who fall under its protection; it is personal not to one particular person but rather to the entire process and all those involved as a group. As one court has noted, "unlike the accountant/client privilege which is personal to the client, the peer review privilege is general in nature and if personal to anyone or anything is personal to the peer review committee and its proceedings." *Basden*, 524 N.E.2d at 1311. No one physician can rightly waive that privilege without possibly doing harm to the process itself and others it protects, and thus to the overall public interests in quality medical care. If anyone can waive the privilege it appears it should be an entity capable of neutrally balancing the interests at stake, such as perhaps an entity responsible for general oversight of medical care (including the peer review process) or a court.[21]

Alabama's peer review statutes do not explicitly address the issue of waiver;

**20.** Order of September 10, 1997 (Doc. no. 22).

**21.** In one sense, the law in the attorney-client context can be helpful in understanding waiver in the peer review context. If the entire peer review process (including all those involved in it) is viewed as comparable to an organization, corporation, or other entity with members, then a single person who is merely involved in the peer review process has no more the unchecked discretion to waive the peer review privilege than an employee or

however, the obligatory limitations on the use of peer review information in the text of the statutes imply a policy against ready waiver. *See* 1975 Ala.Code § 22–21–8(b) (Peer review materials "shall be held in confidence...." ... "No person ... shall be permitted or required to testify."); 1975 Ala.Code § 6–5–333(d) (Peer review records and proceedings "shall be confidential ... and shall not be public records nor be available for court subpoena or for discovery proceedings."). In addition, unlike other states, Alabama provides no exceptions to its general rule, like waiver upon a showing of necessity, or waiver if granted in writing by the appropriate peer review committee. *See, e.g.,* Ind.Code. § 34–4–12.6–2(b) & (c) (Indiana law allowing waiver of peer review privilege if in writing); Va.Code § 8.01–581.17 (Virginia law allowing disclosure "after a hearing and for good cause arising from extraordinary circumstances being shown.")

Federal and state courts have not been uniform in their application of waiver to peer review privilege. *Compare Kymissis v. Rozzi,* No. 93 Civ.8609 (JGK) RCE, 1997 WL 278055 (S.D.N.Y. May 23, 1997) (disclosure of peer review information to a party outside peer review waives the privilege); *Ronald G. Connolly, M.D., P.A. v. Russell J. Labowitz, M.D., P.A.,* 1984 WL 14132 (Del.Sup.Ct.) (parties giving testimony to a peer review committee can waive the privilege as to their testimony, but not committee deliberations); *Claypool v. Mladineo,* 724 So.2d 373, 391 (Miss.1998) (peer review privilege "should also be waived when the peer review proceedings are an integral aspect of the defenses raised") (concurring opinion); *with Burnett v. Ghassem Vakili, M.D., P.A.,* 685 F.Supp. 430 (D.Del.1988) (no waiver of

peer review privilege when party did not follow procedures established to prevent waiver of attorney-client privilege); *Emory Clinic v. Houston,* 258 Ga. 434, 369 S.E.2d 913 (1988) (where statute provides for no discovery of peer review materials, no waiver of the privilege when materials are made public, regardless of the source of publication); *Atkins v. Walker,* 3 Ohio App.3d 427, 445 N.E.2d 1132 (1981) (letter written by a member of a peer review committee remains privileged even after it is given to physician reviewed by the committee); *Sakosko v. Memorial Hosp.,* 167 Ill.App.3d 842, 118 Ill.Dec. 818, 522 N.E.2d 273 (1988) ("disclosure of any privileged information or data, whether proper or improper, shall not waive or have any effect upon the confidentiality, nondiscoverability or nonadmissibility of that information.").

Of course, with these observations, this court is not saying that the peer review privilege cannot and should never be waived. There may be extraordinary and unforeseeable circumstances where the need for waiver simply outweighs public and other interests in the privilege. But a simple desire to sue a furnisher of peer review information is too predictable to outweigh this interest, and, thus, absent legislative authorization, is not allowable under Alabama law.

▬ In light of the obligatory language of the Alabama statutes, and the broad interpretation given the privilege by the Alabama Supreme Court, this court finds the limited view of waiver the correct one under Alabama law. On these facts, where the entity most akin to the "owner" of the privilege (in this case, SAMC) objects to disclosure of the privileged materi-

director (where there is a board of directors) of a corporation or organization would.

als and the person seeking waiver has not shown how the public and other interests would not be disserved by waiver, the objection remains a valid one.[22]

### b. Waiver for failure of to raise privilege in the pretrial order.

■ The failure of Planz to include peer review privilege in the pretrial order also does not prevent him from raising it now. Rule 16(e) of the Federal Rules of Civil Procedure requires that, following the pretrial conference, an order governing the subsequent course of the action shall be entered and modified "only to prevent manifest injustice."[23] There is no dispute that the application of peer review privilege was not raised by either party in the pretrial order. In fact, it was only when non-party witnesses began to move the court to quash their subpoenas or issue protective orders that the issue came to the court's attention. Planz subsequently jumped on the peer-review-privilege bandwagon, and asserted the privilege for testimony about all five of the allegedly defamatory statements.

Marshall is correct to note that "the pretrial order must set forth all of the factual and legal issues to be presented at trial, and that an issue should be considered as waived by the parties if not included in the pretrial order." *Gibbons v. Auburn Univ. at Montgomery*, 108 F.Supp.2d 1311, 1322 (M.D.Ala.2000) (Thompson, J.); *see also Morro v. City of Birmingham*, 117 F.3d 508, 516 n. 3 (11th Cir.1997). Even so, the trial court enjoys significant discretion in determining whether or not an issue is waived when not included in the pretrial order. *See Lexington Ins. Co. v. Cooke's Seafood*, 835 F.2d 1364, 1368 (11th Cir.1988). Exercise of the court's discretion to determine the applicability of the privilege in this case was proper for at least three reasons.

First, Rule 104 of the Federal Rules of Evidence requires the court, not a jury, to determine preliminary questions of admissibility.[24] The existence of a privilege is such a preliminary consideration.

Second, the court reiterates that nothing in this opinion finds that Planz is immune to suit or that by raising the peer review privilege he is asserting a defense. The peer review privilege raised here is evidentiary in nature. Granted, under these particular facts the privilege from testifying effectively prevents Marshall from pursu-

---

**22.** This conclusion necessarily disposes of Marshall's final argument that "usual stipulations" at the beginning of deposition to reserve objections are ineffective on matters of privilege.

**23.** Rule 16(e) provides in relevant part:
"After any [final pretrial] conference ..., an order shall be entered reciting the action taken. This order shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice."

**24.** Rule 104 provides in relevant part:
"(a) Questions of admissibility generally. Preliminary questions concerning the quali-

fication of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.
"(b) Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

ing his claim; but, unlike the circumstances presented in *Gibbons* (failure to raise a claim) and *Morro* (failure to raise a defense), the peer review privilege from testifying does not necessarily alter the claims or defenses before the court. In other words, the court's consideration of the issue after pretrial did not force either party to prepare for a new claim or defense on the eve of trial.

Third, because SAMC was not present at the pretrial conference and was not a party to the pretrial order in this case, it is not bound by that order; there is therefore no question that SAMC has properly raised the privilege. Thus, even if defendants had not asserted the privilege with respect to Planz's testimony, the court would have had to address the issue under SAMC's motion.

As SAMC and other non-parties asserted the privilege, its affect on the anticipated course of trial only increased. The court's rulings on Hannah and Davis—whose testimony was due to be excluded regardless of the pretrial order—independently undermined the factual basis of Marshall's case and similarly threatened defendants' ability to mount a defense. Because SAMC, in order to protect its own statutory and public interests, orally asserted that even Planz was prohibited by the privilege from testifying, the privilege with respect to Planz was squarely and unavoidably before the court.[25] The court has already concluded the privilege is not waivable at the discretion of a person who is merely involved in the process and is not a process decisionmaker (or at the most is

waivable only by a court or the entity overseeing the entire peer review process, which would be SAMC here). Accordingly, the court now further concludes, on this alternative ground, that the application of the privilege with respect to Planz was properly considered by the court as well.

Finally, neither party attempted to sandbag the other by raising it in the eleventh hour. And neither party knew for certain what the effect of the privilege would be when it was raised. The court came to its decision after eight conferences and hearings on the privilege issue and extensive briefing by the parties. To be sure, nothing prevented Planz or Marshall from raising the issue earlier; but once a nonparty did so, it was appropriate for the court to see it through to its conclusion.

### 2. Admissibility of privileged testimony under Fed R. Evid. 804 and Fed.R.Civ.P. 32 & 36

■ When it became clear to Marshall that this court was inclined to exclude on the basis of privilege most of Planz's testimony and most of the testimony of physicians who had been subpoenaed, Marshall gave notice that it was his position that the testimony was still admissible under Rule 804 of the Federal Rules of Evidence and Rules 32 and 36(b) of the Federal Rules of Civil Procedure. Under the authority of Rule 804 and Rule 32, Marshall intended to introduce the excluded testimony by way of depositions because it was "unavailable." Testimony can be "unavailable" under Rule 804(a) if exempted by the court on the ground of privilege.[26] Rule 804(b)(1) allows the introduction of deposition testimony that would otherwise be

---

**25.** Admittedly, SAMC's moved only on behalf of its current and former employees, and Planz was not employed by SAMC. Nevertheless, at a conference held on March 6, 2001, SAMC orally asserted, in addition, that the peer review privilege prohibited Planz from testifying about privileged statements too.

**26.** Rule 804 provides in relevant part:

inadmissible because it is hearsay. *See* Fed.R.Evid. 802. In other words, Rule 804 rehabilitates hearsay testimony; it is not a rule of admission that allows a litigant to get around a state-law privilege. *See Rosenfeld v. Basquiat,* 78 F.3d 84, 89 (2nd Cir.1996). It then follows that Marshall cannot introduce under Rule 804 what has been properly excluded on the grounds of state-law privilege.

Rule 32 allows for the use of depositions at trial "so far as admissible under the rules of evidence."[27] Because the rules of evidence do not allow the introduction of these depositions, they remain inadmissible.

■ Relying Fed.R.Civ.P. 36(b), Marshall also argues that Planz's admission that he told Hannah that Marshall was experiencing emotional difficulties and was potentially suicidal has been "conclusively established" without need for further testi-

"(a) Definition of unavailability. 'Unavailability as a witness' includes situations in which the declarant—... is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement. . . .

"(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

27. Rule 32 provides in relevant part:

"(a) Use of Depositions. At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:

(1) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness, or for any other purpose permitted by the Federal Rules of Evidence.

(2) The deposition of a party or of anyone who at the time of taking the deposition was an officer, director, or managing agent, or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a public or private corporation, partnership or association or governmental agency which is a party may be used by an adverse party for any purpose.

(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:

(A) that the witness is dead; or

(B) that the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of the United States, unless it appears that the absence of the witness was procured by the party offering the deposition; or

(C) that the witness is unable to attend or testify because of age, illness, infirmity, or imprisonment; or

(D) that the party offering the deposition has been unable to procure the attendance of the witness by subpoena; or

(E) upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.

. . . . .

"(b) Objections to Admissibility. Subject to the provisions of Rule 28(b) and subdivision (d)(3) of this rule, objection may be made at the trial or hearing to receiving in evidence any deposition or part thereof for any reason which would require the exclusion of the evidence if the witness were then present and testifying."

mony.[28] This argument is also inapposite. Rule 36(b) is not a rule of admissibility. The purpose of the rule "is to expedite trial by removing essentially undisputed issues, thereby avoiding the time, trouble and expense which otherwise would be required to prove those issues." *Burns v. Phillips*, 50 F.R.D. 187, 188 (N.D.Ga.1970). There is no present dispute as to whether Planz made the statement to Hannah. The issue is whether Planz or Hannah can invoke the peer review privilege to avoid testifying. Accordingly, Rule 36(b) has no effect.

### 3. Whether the Statement by Planz to Pelle was Part of this Litigation.

As this court's privilege rulings whittled away at the sources of publication that Marshall could rely upon at trial, Marshall indicated that Planz's statement to Fred Pelle, SAMC's chief executive officer, about Marshall's suicidal intentions and mental health was also actionable. The

only evidence of the statement at issue comes from Pelle's deposition:

"Q: Did Dr. Planz ever talk to you about Dr. Marshall's mental status?

"Pelle: Yes, he did.

. . . . .

"Q: What did he tell you?

"Pelle: He suggested that Dr. Marshall was experiencing some emotional problems including potentially being suicidal, and was unable to perform his functions very well. . . .

"Q: Did Dr. Planz tell you that Dr. Marshall had a personality disorder?

"Pelle: He used that term in describing Dr. Marshall and being suicidal."

Pelle Dep. at 40–41. The peer review privilege was asserted by SAMC for Pelle, and, in an earlier order, the court concluded that his testimony was due to be excluded.[29] That order did not address whether Planz himself (as opposed to

---

**28.** And Rule 36(b) provides in relevant part:

"(b) Effect of Admission. Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission. Subject to the provision of Rule 16 governing amendment of a pretrial order, the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits. Any admission made by a party under this rule is for the purpose of the pending action only and is not an admission for any other purpose nor may it be used against the party in any other proceeding."

**29.** In the order of March 16, 2001 (Doc. no. 330), the court explained:

"Several words are in order concerning Pelle's role in the peer review process.

During the period in question, Pelle was the chief operating officer, then interim chief executive officer, of SAMC. As such, he was an ex officio member of the SAMC Executive and Credentials Committee, which has among its responsibilities the periodic review of the performance and clinical competence of staff members. According to Pelle's testimony, he would direct information he received about a physician's performance, including information from Planz about Marshall, to the appropriate peer review authorities.

THE COURT: Okay. Now why would that have been an appropriate statement made to you by a doctor, what are you supposed to do with the statement?

'A: I think that I would generally need to be made aware, since I was, you know, would have been representing the hospital and furnishing services to the physicians through nursing care and other, you know, patient care activities, that I should be aware of the potential for problems that might occur. And that that was being given

Pelle) can testify about his statement to Pelle; but for the same reasons that Pelle cannot testify about the statement, Planz cannot either.

Nevertheless, as an alternative ground justifying the exclusion of the Pelle publication, the court turns to that question again. The problem with Planz's statement to Pelle, regardless as to whether Planz or Pelle testifies about it, is that it was not specifically included in the pretrial order. That order, in keeping with this court's prior orders on defamation,[30] set out five "categories" of allegedly defamatory statements for trial. One category covered statements by Planz about Marshall's mental health:

> to me as sort of a heads up. That's typically why someone would approach me with that type of comment.
> THE COURT: If you had concerns, what would you do with the comment, if you had concerns about the comment?
> 'A: I would route those back through the medical staff leadership.
>
> . . . . .
>
> THE COURT: Do you remember whether or not you passed this information that you had received from Dr. Planz in particular the statement about Dr. Marshall perhaps being suicidal or unable to perform his functions, to any of the peer review committees that were then reviewing Dr. Marshall's performance?
> 'A: I don't recall specifically. What I did with that information, however, this had been such a topic of concern over a long period of time, that it was an ongoing work in progress and so it was very likely that I did, but I.don't recall that.
> THE COURT: Are you familiar with how the peer review process works at the hospital?
> 'A: I don't remember the exact process or—
> THE COURT: Well I mean the general process.
> 'A: Yes, I'm familiar with the general process.
> THE COURT: Okay. Did you consider yourself as one of the people who was re-

"Dr. Marshall may be suicidal or out of touch with reality and that Dr. Marshall had a significant personality disorder (*at least* 2 statements to Dr. Wayne Hannah, SAMC's medical staff director, and Dr. Richard Davis, a doctor with the American Medico–Legal Foundation that was reviewing SAMC's cardiac surgery program)."

Order on pretrial hearing, filed February 7, 2001 (emphasis added).[31] Marshall has argued that the pretrial order did not require that he list each actionable statement with specificity and that, because he had cited to Pelle's deposition in earlier submissions to the court, defendants were not prejudiced.[32]

> ceiving information that would be funneled to the hospital or to the committees for use in that peer review process?
> 'A: Well I—yes. Yes.
> THE COURT: Okay. Was this information part of that information that you would have received as part of the peer review process to pass on?
> 'A: I believe that to be the case.'
> Supp. Dep. of Fred Pelle, conducted March 15, 2001 (by telephone conference call). On the basis of Pelle's position on the Executive and Credentials Committee, and the clear understanding by Pelle and others that Marshall's performance was a matter undergoing peer review, the court is convinced that Planz's statement to Pelle about Marshall's mental health was effectively information furnished to a peer review committee. Accordingly, Pelle's testimony is privileged under 1975 Ala.Code §§ 6–5–333 and 22–21–8."

**30.** *See Marshall*, 13 F.Supp.2d 1246 and Order of October 27, 2000 (Doc. no. 214).

**31.** Doc. no. 232.

**32.** Marshall did not indicate with specificity the Pelle publication in his briefs, but he did cite to Pelle's deposition as evidence of republication. *See* Plaintiff's opposition to defendants' motion for summary judgment, filed May 5, 1998 (Doc. no. 117). Defendants ac-

 Failure to include the statement in . the pretrial order waives the claim. The statement to Pelle could have been an independently actionable claim by Marshall for defamation. Unlike the failure of the parties to raise the peer review privilege, which was an evidentiary issue, the statement of Planz to Pelle is squarely a "legal or factual issue to be presented at trial." *See Morro,* 117 F.3d at 516 n. 3. The general claim that Planz made "at least 2 statements" about Marshall's mental health provides insufficient notice to defendants that a statement to Pelle would be at issue during trial.[33] Especially here, where Planz could offer a different defense for each allegedly defamatory statement, the importance of knowing that the statement would be at issue is paramount for the defendants to plan their defense strategy. Further, it is of no consequence that the Pelle publication had been mentioned in the parties' earlier briefs, because the pretrial order controls the issues set for trial. *See id.; Gibbons,* 108 F.Supp.2d at 1322. For whatever reason, a plaintiff successful at the summary-judgment stage could choose not to pursue a claim at trial. Accordingly, the court concludes that even if Pelle's statement was not covered by the peer review privilege, it is still not properly part of this litigation.

### III. CONCLUSION

For the reasons stated above, the court concludes that §§ 22–21–8 and 6–5–333 apply to the proposed testimony at issue from Planz and nonparty witness Hannah as set forth in this opinion. Because it is covered by the peer review privilege, this testimony cannot be given at trial.[34]

knowledged Planz's statement to Pelle with greater specificity than Marshall. *See* Defendants' brief in support of motion for summary judgment, filed March 18, 1998 (Doc. no. 75), at 13 ("Dr. Marshall alleges that Dr. Planz defamed him by making comments to Dr. Hannah … and Fred Pelle, the acting CEO of the hospital, that Dr. Marshall was suicidal and/or had a personality disorder or emotional problems.")

33. The court notes that its reading of the pretrial order is in itself generous to Marshall. Another—perhaps more reasonable—reading of the order is that two statements were made by Planz to Hannah, and an additional statement was made to Davis. The specificity with

which Marshall refers to these statements strongly implies that they are the only statements at issue in this category.

34. This memorandum opinion serves as also the basis for the decisions rendered in earlier orders which noted that a memorandum opinion would follow. *See, e.g.,* Order of March 16, 2001 (Doc. no. 329) (addressing admissibility of testimony under Fed.R.Evid. 804 and Fed.R.Civ.P. 32 & 36); Order of March 15, 2001 (Doc. no. 319) (testimony of Dr. Clifton). In addition, this order is consistent with the court's other rulings applying the privilege.